658 F.2d 310
 SEMINOLE TRIBE OF FLORIDA, an Organized Tribe of Indians, as
recognized under and by the Laws of the United
States, Plaintiff-Appellee,
v.
Robert BUTTERWORTH, the duly elected Sheriff of Broward
County, Florida, Defendant-Appellant.
 No. 80-5496.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Oct. 5, 1981.
 Shailer & Purdy, Philip S. Shailer, Fort Lauderdale, Fla., for defendant-appellant.
 Kent A. Zaiser, Asst. Atty. Gen., Dept. of Legal Affairs, Civ. Div., Tallahassee, Fla., for amicus State of Florida.
 Stephen H. Whilden, Hollywood, Fla., Marion Sibley, Miami Beach, Fla., Jesse J. McCrary, Jr., Miami, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before MORGAN, RONEY and KRAVITCH, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 This appeal involves a question arising under Public Law 280, the federal law permitting states to exercise civil and criminal jurisdiction over the Indian tribes. All parties agree that the case turns on the determination of whether Florida Statute Section 849.093 which permits bingo games to be played by certain qualified organizations subject to restrictions by the state is civil/regulatory or criminal/prohibitory in nature. If the statute is civil/regulatory within the meaning of Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the statute cannot be enforced against the Seminole Tribe of Florida.
 
 
 2
 This lawsuit commenced when the Seminole Indian tribe brought an action under 28 U.S.C. §§ 2201 and 2202, seeking a declaratory judgment and injunctive relief against Robert Butterworth, the sheriff of Broward County, Florida. The Seminole tribe had contracted with a private limited partnership that agreed to build and operate a bingo hall on the Indian reservation in exchange for a percentage of the profits as management fees. Anticipating violation of the Florida bingo statute, Sheriff Butterworth informed the tribe that he would make arrests for any violations of Fla.Stat. § 849.093.[1] The attorney general of the state of Florida filed a petition on behalf of the state seeking leave to participate in the case as amicus curiae, and leave was granted. Relying on stipulated facts, the parties filed cross motions for summary judgment, presenting the question to the district court, 491 F.Supp. 1015, whether the statute could be enforced against the Indian nation. After finding that the case satisfied the "case or controversy" requirement of the Constitution, the district judge granted the plaintiff's motion for summary judgment on the ground that the statute in question was regulatory in nature and therefore could not be enforced against the Indian tribe. The lower court enjoined the sheriff from enforcing the statute against the plaintiff. The sheriff of Broward County and the State of Florida appealed the lower court's decision to this court, but agreeing with the lower court, we affirm its decision.
 
 
 3
 I. Can Indians Operate Bingo Halls?
 
 
 4
 The states lack jurisdiction over Indian reservation activity until granted that authority by the federal government; however, Sections 2 and 4 of Public Law 280[2] granted certain states the right to exercise criminal jurisdiction and limited civil jurisdiction over the Indian tribes. Section 7 of the Act[3] granted to other states the right to assume criminal and civil jurisdiction by legislative enactment, and although this section was repealed in 1968 by Section 403(b) of Public Law 90-284, any cessions of jurisdiction made pursuant to the Act prior to its repeal were not affected. Pursuant to the former Public Law 280 the state of Florida assumed criminal jurisdiction over reservation Indians in Fla.Stat. § 285.16. By this enactment, Florida assumed jurisdiction over the Indians to the full extent allowed by the law.
 
 
 5
 In Bryan v. Itasca County, supra, 426 U.S. at 383, 96 S.Ct. at 2108, the Supreme Court of the United States interpreted Public Law 280 as granting civil jurisdiction to the states only to the extent necessary to resolve private disputes between Indians and Indians and private citizens. In Bryan the petitioner Indian sought relief from a personal property tax that the state had levied against his mobile home. The Court interpreted the language of Section 4(a) of Public Law 280[4] providing for civil jurisdiction as follows:
 
 
 6
 (S)ubsection (a) seems to have been primarily intended to redress the lack of Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes .... (The statute) authorizes application by the state courts of their rules of decision to decide such disputes. Id. at 383-84, 96 S.Ct. at 2108.
 
 
 7
 After further discussion the Court concluded that "if Congress in enacting Pub.L. 280 had intended to confer upon the States general civil regulatory powers, including taxation over reservation Indians, it would have expressly said so." Id. at 390, 96 S.Ct. at 2111. Although the Supreme Court was interpreting the language of Public Law 280 as directed at the six mandatory states, it is clear that these same limitations on civil jurisdiction would apply to a state that assumed jurisdiction pursuant to Section 7 of the former Public Law 280. Thus, the mandate from the Supreme Court is that states do not have general regulatory power over the Indian tribes.
 
 
 8
 The difficult question remaining in a case such as the present one is whether the statute in question represents an exercise of the state's regulatory or prohibitory authority. The parties have presented the question for decision to this court in that form, and several cases out of the Ninth Circuit have addressed similar Indian problems with the same or a similar analysis. See United States v. Farris, 624 F.2d 890 (9th Cir. 1980); United States v. County of Humboldt, 615 F.2d 1280 (9th Cir. 1980); United States v. Marcyes, 557 F.2d 1361 (9th Cir. 1977). See also Santa Rosa Band of Indians v. Kings County, 532 F.2d 655 (9th Cir. 1975). Thus, under a civil/regulatory versus criminal/prohibitory analysis, we consider the Florida statute in question to determine whether the operation of bingo games is prohibited as against the public policy of the state or merely regulated by the state.
 
 
 9
 Fla.Stat. Section 849.093[5] provides that the general prohibition against lotteries does not apply to prevent "nonprofit or veterans' organizations engaged in charitable, civic, community, benevolent, religious or scholastic works or other similar activities ... from conducting bingo games or guest games, provided that the entire proceeds derived from the conduct of such games shall be donated by such organizations to the endeavors mentioned above." Id. Section 2 of the statute sets out conditions of operation for organizations not engaged in the charitable activities listed above. The remaining sections of the statute state restrictions for the operation of bingo games and penal sanctions for violation of those provisions.[6] Although the inclusion of penal sanctions makes it tempting at first glance to classify the statute as prohibitory, the statute cannot be automatically classified as such. A simplistic rule depending on whether the statute includes penal sanctions could result in the conversion of every regulatory statute into a prohibitory one. See United States v. Marcyes, supra, 557 F.2d at 1364. The classification of the statute is more complex, and requires a consideration of the public policy of the state on the issue of bingo and the intent of the legislature in enacting the bingo statute.
 
 
 10
 The Florida Constitution provides: "lotteries, other than the types of pari-mutuel pools authorized by law ..., are hereby prohibited in this state." Art. X, § 7, Fla.Const. The legislature has the power to prohibit or regulate all other forms of gambling, and in Greater Loretta Improvement Ass'n. v. State ex rel. Boone, 234 So.2d 665 (Fla.1970), the Florida Supreme Court recognized that bingo was one of the forms of gambling, along with horse racing, dog racing, and jai alai, excepted from the lottery prohibition and permitted to be regulated by the state. Based on the definition of "pari-mutuel" and the fact that the bingo statute was enacted the same year that the Constitution was revised, the court held that the bingo statute did not violate the Constitution of Florida. In a later constitutional challenge, Carroll v. State, 361 So.2d 144 (Fla.1978), the Supreme Court of Florida stated that
 
 
 11
 while the legislature cannot legalize any gambling device that would in effect amount to a lottery, it has an inherit power to regulate or to prohibit any and all other forms of gambling. In exercising this power to regulate, the legislature, in its wisdom, has seen fit to permit bingo as a form of recreation, and at the same time, has allowed worthy organizations to receive the benefits. (citations omitted) (emphasis added) Id. at 146-47.
 
 
 12
 Although this language suggesting that the legislature has chosen to regulate bingo is not binding on this court as to whether the statute is regulatory or prohibitory, the language indicates that the game of bingo is not against the public policy of the state of Florida. See also State v. Appelbaum, 366 So.2d 443 (Fla.1979) ("The statute... regulates the conduct of bingo...."). Bingo appears to fall in a category of gambling that the state has chosen to regulate by imposing certain limitations to avoid abuses. Where the state regulates the operation of bingo halls to prevent the game of bingo from becoming a money-making business,[7] the Seminole Indian tribe is not subject to that regulation and cannot be prosecuted for violating the limitations imposed.
 
 
 13
 In holding that the bingo statute in question is regulatory, we must address two Ninth Circuit cases in which similar issues were raised. In United States v. Marcyes, supra, 557 F.2d at 1364, the Ninth Circuit held that a fireworks statute of the state of Washington was a prohibitory statute of the state, and therefore was necessarily included within the ambits of the Assimilative Crimes Act, 18 U.S.C. § 13. The fireworks statute, like the bingo statute in question, permitted the activity to take place under certain circumstances. Despite these exceptions, to the statute, however, the Ninth Circuit found that the statute's "intent was to prohibit the general possession and/or sale of dangerous fireworks" and that it was "not primarily a licensing law." Id. The lower court in the present case relied on Marcyes for its discussion of the regulatory/prohibitory distinction, but distinguished the case based on the fact that fireworks are dangerous items that, if bought on an Indian reservation, can be carried off of it. The operation of bingo halls, on the other hand, must necessarily remain on the reservation. Although the distinction is a legitimate one, the determination underlying it is a legislative decision which we are not at liberty to make. Instead we find that the real distinction between the cases lies in the reference to each state's law as to whether the statutes in question were prohibitory or regulatory. Legislative intent determines whether the statute is regulatory or prohibitory, and although the state of Florida prohibits lotteries in general, exceptions are made for certain forms of gambling including bingo. All parties agree that forms of gambling such as horse racing are regulated in Florida, and indeed the petitioner admits that the Indians could engage in the operation of horse racing activities without interference by the state. Petitioner suggests that the distinction between bingo and horse racing lies within the licensing requirements; however, we find that argument without merit. Regulation may appear in forms other than licensing, and the fact that a form of gambling is self-regulated as opposed to state-regulated through licensing does not require a ruling that the activity is prohibited.
 
 
 14
 In a more recent and in some respects more similar case, United States v. Farris, supra, 624 F.2d 890, the Ninth Circuit found that members of the Puyallup Indian tribe could not be prohibited from operating a gambling casino on the reservation because the state of Washington had not assumed jurisdiction over gambling offenses. However, in considering whether the provisions of 18 U.S.C. § 1955 of the Organized Crime Control Act of 1970 could apply to non-Indians gambling on the reservation, the Ninth Circuit analyzed the public policy of the state of Washington and determined that the state prohibited professional gambling. The court found that the "violation of a law of a state" requirement of section 1955 was intended to exempt from federal prosecution the operators of gambling business in states where gambling was not contrary to the public policy of the state, and the legislative declaration in Washington's gambling statute indicated a clear legislative intent to prohibit professional gambling.[8] Specifically noting the exception of Florida fronton operators to the gambling provisions, the court reiterated that the federal statute could apply only in states where gambling was illegal. Washington, unlike Florida, was such a state, and thus the statute could be enforced against non-Indians gambling on the reservation. Cf. Rincon Band of Mission Indians v. County of San Diego, 324 F.Supp. 371 (S.D.Calif.1971), rev'd on other grounds, 495 F.2d 1 (9th Cir. 1974) (court held local ordinance prohibiting gambling was within ambit of phrase "laws of such state" of Public Law 280 so that gambling provisions could apply to Indians on the reservation).
 
 
 15
 Although the Ninth Circuit found that the casino operation of the Puyallup Indians was a "violation of the law of a state" for which non-Indians could be prosecuted under the federal gambling law, the case supports the proposition that the state's public policy determines whether the activity is prohibited or regulated. Although the Florida Constitution, the Florida Supreme Court, and the Florida legislature have in various forms denounced the "evils of gambling," it is clear from the provisions of the bingo statute in question and the statutory scheme of the Florida gambling provisions considered as a whole that the playing of bingo and operation of bingo halls is not contrary to the public policy of the state. Other courts prohibiting other forms of gambling have found those forms of gambling contrary to the public policy of the state. As the district court noted, this case presents a close and difficult question. The Supreme Court in interpreting Public Law 280 has stated that "statutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Bryan v. Itasca County, supra, 426 U.S. at 392, 96 S.Ct. at 2112. Although the regulatory bingo statute may arguably be interpreted as prohibitory, the resolution must be in favor of the Indian tribe.
 
 
 16
 II. Can Non-Indians Play?
 
 
 17
 Although we have concluded that the Florida bingo statute cannot be enforced against the Seminole tribe, Sheriff Butterworth and the State of Florida petition this court for a ruling requiring the Seminole Indians to distinguish between Indians and non-Indians and abide by the restrictions of the statute as to non-Indians. It is not altogether clear how petitioner proposes that such distinctions practically could be made without prohibiting non-Indians from play or imposing the restrictions on all players, Indian and non-Indian alike. Furthermore, the relief sought continues to request the right to enforce regulation of the Indians operation of bingo games. We reject petitioner's argument for these and the following reasons.
 
 
 18
 First, as respondent strongly points out, the argument was never presented below. The issue presented to the district judge on stipulated facts involved only the question of whether the statute could be enforced to prevent the Indians from violating its restrictions. As a general rule the court of appeals need not address issues raised for the first time by a party on appeal. See Adams v. Askew, 511 F.2d 700 (5th Cir. 1975); D.H. Overmyer Co. v. Lofling, 440 F.2d 1213 (5th Cir. 1971). Furthermore, we note that the statute in question, Fla.Stat. § 849.093, makes no reference to violations of its restrictions by the players of bingo. Sheriff Butterworth suggests that several general lottery prohibition statutes, such as Fla.Stat. §§ 849.08, 849.09(1)(b), and 849.09(2), permit the arrest of bingo players as players of illegal lotteries; however, we refuse to recognize in one breath that bingo is excluded from the general lottery prohibition and in the next permit the arrest of bingo players as players of illegal lotteries. The statutes cited must be considered in pari materia with the bingo statute permitting the operation of bingo games. The bingo statute does not prohibit the playing of bingo games in violation of its restrictions, and if the legislature of the state of Florida desires to prohibit such, then it must act accordingly. The courts that have prohibited Indians or non-Indians from gambling on reservations have done so in light of a statute that specifically prohibits the act of gambling. In Florida, unlike in Washington, no distinction exists between Indians and non-Indians for the legality (or illegality) of certain gambling activities. Thus, petitioner's attempts to require the Seminoles to distinguish between Indian and non-Indian players are to no avail.[9] The decision of the lower court is
 
 
 19
 AFFIRMED.
 
 RONEY, Circuit Judge, dissenting:
 
 20
 I respectfully dissent on the ground that the State of Florida has prohibited, not regulated, the precise kind of bingo operation which the plaintiff seeks to conduct. As a matter of fact, it is because such activity is prohibited in Florida that this business was started and is successful. The reasons that Florida laws prohibit such a bingo business, focusing on the indirect consequences of it, whether right or wrong, are as applicable to a bingo casino on the Indian reservation as they are to such a business off a reservation. If only Indians were involved, or if the effects of the bingo casino were shown to be confined to the reservation, the decisions relied upon by the Court might be applicable. Without such a showing, in my opinion, they are not. I would reverse.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 The Florida bingo statute provides as follows:
 
 
 [849]
 093 Charitable, nonprofit organizations; certain endeavors permitted
 (1) As used in this section:
 (a) "Bingo game" means and refers to the activity commonly known as "bingo" wherein participants pay a sum of money for the use of one or more cards. When the game commences, numbers are drawn by chance, one by one, and announced. The players cover or mark those numbers on the cards which they have purchased until a player receives a given order of numbers in sequence that has been preannounced for that particular game. This player calls out "bingo" and is declared the winner of a predetermined prize. More than one game may be played upon a bingo card, and numbers called for one game may be used for a succeeding game or games.
 (b) "Bingo card" means and refers to the flat piece of paper or thin pasteboard employed by players engaged in the game of bingo. More than one set of bingo numbers may be printed on any single piece of paper.
 (2) None of the provisions of this chapter shall be construed to prohibit or prevent nonprofit or veterans' organizations engaged in charitable, civic, community, benevolent, religious, or scholastic works or other similar activities, which organizations have been in existence for a period of 3 years or more, from conducting bingo games or guest games, provided that the entire proceeds derived from the conduct of such games, less actual business expenses for articles designed for and essential to the operation, conduct, and playing of bingo, shall be donated by such organizations to the endeavors mentioned above. In no case shall the net proceeds from the conduct of such games be used for any other purpose whatsoever. The proceeds derived from the conduct of bingo games shall not be considered solicitation of public donations.
 (3) If an organization is not engaged in efforts of the type set out above, its right to conduct bingo or guest games hereunder shall be conditioned upon the return of all the proceeds from such games to the players in the form of prizes. If at the conclusion of play on any day during which a bingo or guest game 1 is allowed to be played under this section there remain proceeds which have not been paid out as prizes, the nonprofit organization conducting the game shall at the next scheduled day of play conduct bingo or guest games without any charge to the players and shall continue to do so until the proceeds carried over from the previous days played have been exhausted. This provision in no way extends the limitation on the number of prize or jackpot games allowed in one night as provided for in subsection (5).
 (4) The number of days during which such organizations as are authorized hereunder may conduct bingo or guest games per week shall not exceed two.
 (5) No jackpot shall exceed the value of $100 in actual money or its equivalent, and there shall be no more than one jackpot in any one night.
 (6) There shall be only one prize or jackpot on any one day of play of $100. All other game prizes shall not exceed $25.
 (7) Each person involved in the conduct of any bingo or guest game must be a resident of the community where the organization is located and a bona fide member of the organization sponsoring such game and shall not be compensated in any way for operation of said bingo or guest game.
 (8) No one under 18 years of age shall be allowed to play.
 (9) Bingo or guest games shall be held only on the following premises:
 (a) Property owned by the nonprofit organization;
 (b) Property owned by the charity or organization that will benefit by the proceeds;
 (c) Property leased full time for a period of not less than 1 year by the nonprofit organization or by the charity or organization that will benefit by the proceeds;
 (d) Property owned by and leased from another nonprofit organization qualified under this section; or
 (e) Property owned by a municipality or a county when the governing authority has, by appropriate ordinance or resolution, specifically authorized the use of such property for the conduct of such games.
 (10) Any organization or other person who willfully and knowingly violates any provision in this section is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. For a second or subsequent offense, the organization or other person is guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
 
 
 [2]
 The two sections were codified at 18 U.S.C.A. § 1162 and 28 U.S.C.A. § 1360, respectively. The first section concerned state assumption of criminal jurisdiction and the second involved assumption of civil jurisdiction. These sections were directed at the willing states of California, Minnesota, Nebraska, Oregon and Wisconsin (later adding Alaska), which are sometimes referred to as the mandatory states because the assumption of jurisdiction was dictated by the statute
 
 
 [3]
 67 Stat. 590 (1953) (repealed by Pub.L. 90-284, Title IV, § 403, 82 Stat. 79 (1968). The former section provided:
 The consent of the United States is hereby given to any other state not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this act, to assume jurisdiction at such time and in such manner as the people of the state shall by affirmative legislative action obligate and bind the state to assumption thereof.
 The repeal changed the law to require the consent of the Indians to any further assumption of jurisdiction.
 
 
 [4]
 See note 2 supra. Section 4(a) provides:
 (a) Each of the States or Territories listed ... shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country ... to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory ....
 
 
 [5]
 For the text of the statute, see note 1 supra
 
 
 [6]
 The statute as originally enacted contained no penal sanctions for its violation. The penalties were added by amendment in 1973, Laws 1973, c. 73-229, § 1. Arguably, the original enactment of the statute without penal sanctions indicates a legislative intent that the statute be construed as regulatory
 
 
 [7]
 Arguably, the Florida bingo statute could be viewed as a narrow exception to the general prohibition against lotteries, permitting bingo operations only when the activity was recreational or charitable, and not for profit. Under this view urged by petitioner, professional, money-making bingo operations continue to be prohibited. Even if we were to accept this view of the statute as prohibiting professional bingo, the Seminole Indian tribe could arguably qualify as a nonprofit organization "engaged in charitable, civic, community, benevolent, religious or scholastic works or other similar activities" as prescribed in the statute. The Seminole's complaint alleges that the profits received by the tribe from the bingo activities are to be invested for the betterment of the Indian community. Although the Indian nation may not qualify as a charitable organization within the letter of the statute, the Seminole tribe could be said to fall within the spirit of its permissive intent
 
 
 [8]
 The Wash.Rev.Code § 9.46.010 provides:
 It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; (and) to restrain all persons from patronizing such professional gambling activities....
 
 
 [9]
 The petitioner has cited a line of cases culminating in Washington v. Confederated Tribes, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), for the proposition that states can require Indians to apply state regulations to non-Indians who engage in activity on Indian reservations. Washington v. Confederated Tribes, supra, involved the imposition of a state sales tax on the purchase of cigarettes. The Court required an Indian smoke shop owner to precollect the tax imposed on the buyer. Although we recognize the validity of the line of cases cited, we note that an important distinction exists between the present case and those cases where regulations are imposed on non-Indians. In the present case the only regulation involved is directed at the Indian operators of the bingo hall, not its non-Indian bingo player. Thus, even if we were to fully address petitioner's argument, the line of cases cited would not require a contrary holding