**Bertney LANGLEY, et al**

v.

**Alfred R. RYDER, District Attorney of 33rd Judicial District, Allen Parish, Louisiana; et al.**

**Civ. A. No. 85–0030.**

United States District Court, W.D. Louisiana, Lake Charles Division.

Feb. 12, 1985.

As Amended March 15, 1985.

Carroll L. Spell, Lafayette, La., for plaintiffs.

Alfred R. Ryder, Dist. Atty., 33rd Judicial Dist., Oberlin, La., for defendants.

Henry J. Sockbeson, Native American Rights Fund, Washington, D.C., for intervenor.

## OPINION

VERON, District Judge.

The plaintiffs in this suit are certain members of the Coushatta Tribe of Louisiana who have been charged with state law offenses allegedly committed on federal land held in trust for the Tribe. The plaintiffs seek an injunction restraining Allen Parish officials from proceeding with these charges in state court. They contend that Louisiana lacks jurisdiction to apply state criminal law to offenses committed by Indians on Indian territory. This matter came before the Court on January 18, 1985 on the plaintiffs' petition for a preliminary injunction. This narrative opinion will serve as the Findings of Fact and Conclusions of Law required by Federal Rule of Civil Procedure 52(a).

## BACKGROUND

On August 30, 1984, a group claiming to be the Coushatta Tribe of Louisiana initiated a civil action seeking declaratory and injunctive relief from this Court. *See Coushatta Tribe of Louisiana v. State of Louisiana, et al.,* Civil Action No. 84–2371–LC, Western District of Louisiana, Lake Charles Division. The plaintiffs in that suit prayed for an injunction restraining state officials from applying state licensing and taxation laws to the Tribe's business operations, such as bingo, gaming and sales of gasoline, cigarettes, alcoholic beverages and food. The Tribe also sought a declaratory judgment delineating the scope of permissible state regulation of Indian activity on tribal territory. A hearing was held on August 30, 1984 but no ruling was made at that time because the plaintiff withdrew its application for temporary and preliminary injunctive relief. The application for a permanent injunction and for declaratory relief was referred to a trial on the merits, to be held at a later unspecified date. Subsequently, on January 16, 1985, the case was dismissed by the Clerk pursuant to Rule 14 of the Local Rules of the Western District of Louisiana, which provides for dismissal of actions for lack of prosecution. Thus, the claims for relief asserted in that suit are no longer before the Court.

In the meantime, plaintiffs Bertney Langley, Jack LeBlanc, Sharon Doise, Leonard Battise, Michael Pierotti, Patrick LeBlanc, Burl Sonnier, Wayne Doise and Debra Sonnier were arrested by Allen Parish Sheriff's Deputies and charged with conducting gambling operations as a business in violation of La.R.S. 14:90. These plaintiffs had allegedly been operating blackjack, pull-tab, roulette wheels and similar gambling games and had also been conducting a bingo game on tribal territory without obtaining a license under the Louisiana Charitable Raffles, Bingo and Keno Licensing Law, La.R.S. 33:4861.1, *et seq.* Bingo constitutes gambling under state criminal law but the licensing law grants immunity from prosecution to those who obtain a lawful license. *See* La.R.S. 33:4861.15(3). Plaintiff Lee David Poncho was arrested and charged with aggravated battery. Plaintiff Hilton Langley was arrested and charged with attempted second degree murder. As of January 18, 1985, no indictments had been returned nor had any bills of information been filed on any of these charges. The plaintiffs arrested on gambling charges have moved to quash the arrest warrants in state court.

On January 4, 1985, all of the aforementioned plaintiffs filed a petition for injunctive relief in this Court, seeking to restrain Allen Parish officials from prosecuting the

criminal charges. On that same date, the Court issued a temporary restraining order and set the matter for hearing. On January 16, 1985 an entity claiming to be the Coushatta Tribe of Louisiana moved to intervene in the action in order to protect the Tribe's interests in the bingo operations. Shortly thereafter, several members of the Tribe filed an opposition to the petition for intervention, challenging the right of the intervenor to represent the Tribe and contending that the bingo operations were not officially authorized by the Tribe. A hearing was held on the petitions for preliminary injunctive relief and for intervention on January 18, 1985. The plaintiffs orally requested declaratory relief at this time. After hearing the arguments and evidence, the Court dissolved the temporary restraining order and took the matter under advisement to study the law and evidence.

ISSUES

Basically, this suit presents four issues:

(1) Whether the Anti-Injunction Act, 28 U.S.C. § 2283, and the doctrine of equitable restraint mandate dismissal of this suit for injunctive and declaratory relief restraining state criminal proceedings;

(2) Whether the State of Louisiana has jurisdiction to apply its criminal law against conducting gambling, operations as a business La.R.S. 14:90, to gambling operations conducted by Indians on the land currently occupied by the Coushattas;

(3) Whether the State of Louisiana has jurisdiction to apply its criminal laws against aggravated battery, La.R.S. 14:34, and attempted second degree murder, La.R.S. 14:27 & 14:30.1, to offenses committed by Indians on the land currently occupied by the Coushattas; and

(4) Whether the "Coushatta Tribe of Louisiana" should be permitted to intervene in this action.

*The Propriety of Injunctive and Declaratory Relief*

■ Prior to the hearing on this matter, the Court requested the parties to address the question of whether the Anti-Injunction Act, codified as amended at 28 U.S.C. § 2283, and the doctrine of equitable restraint enunciated in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), should apply here. Section 2283 provides that a federal court may not enjoin a pending state judicial proceeding except where expressly authorized by Congress, where necessary in aid of the federal court's jurisdiction or in order to protect or effectuate a federal court order or judgment. If the barrier posed by section 2283 is cleared in regard to a pending state criminal proceeding, then *Younger* nonetheless mandates dismissal of the federal suit for injunctive relief unless the federal plaintiff demonstrates that his state-court defense will not adequately protect his federal rights because of bad faith, harassment, or other unusual circumstances. *Younger,* 401 U.S. at 53–54, 91 S.Ct. at 754–55; *see generally* Comment, *Federal Injunctive Relief Against Pending State Civil Proceedings:* Younger *Days are Here Again,* 44 La.L.Rev. 967 (1984). The *Younger* doctrine also bars declaratory relief when the federal plaintiff is raising issues that are intertwined with a pending state criminal proceeding brought against him. *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

■ After a review of the evidence and the applicable law, the Court concludes that section 2283 does not apply here because state criminal proceedings were not in fact pending at the time the federal complaint was filed. In *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), the Supreme Court held that state criminal proceedings were not pending within the intendment of section 2283 because the Louisiana grand jury had not been convened and indictments had not been obtained until after the filing of the federal complaint. 380 U.S. at 484 n. 2, 85 S.Ct. at 1119 n. 2. Here, arrest warrants had been issued and arrests made at the time of the filing of the federal complaint, but no bill of information or indictment had

been filed in state court. State criminal proceedings therefore were not pending and section 2283 does not bar the injunctive relief sought here. *See also* La.Code Crim. Pro. art. 382 (criminal prosecution instituted by way of indictment, information, or affidavit); *cf. Barancik v. Investors Funding Corp.,* 489 F.2d 933 (7th Cir.1973) (section 2283 does not bar issuance of the injunction if the state action was not pending when the federal injunction is sought, even though the state action commenced prior to federal action on the request; *but cf. Roth v. Bank of the Commonwealth,* 583 F.2d 527 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979) (contrary view).[1]

■ The *Younger* doctrine also does not apply here, although for a slightly different reason. In contrast to section 2283, the fact that state court proceedings were not pending at the filing of the federal complaint is not controlling under the *Younger* doctrine; the federal court must dismiss the complaint if state court proceedings commence before "any proceedings of substance on the merits" take place in the federal court. *Hicks v. Miranda,* 422 U.S.

332, 349, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975). The meaning of the phrase "any proceedings of substance on the merits" may be "a good deal less than apparent," 422 U.S. at 353 n. 1, 95 S.Ct. at 2294 n. 1 (Stewart, J., dissenting), but here there can be no question that *Younger* does not apply, as the District Attorney still has not commenced state criminal proceedings. And, in any event, the defendant Allen Parish officials have waived any objections that they might have under *Younger.* They would rather have this Court decide the jurisdictional issue as promptly as possible. *Cf. Sosna v. Iowa,* 419 U.S. 393, 396 n. 3, 95 S.Ct. 553, 556 n. 3, 42 L.Ed.2d 532 (1975) (the Court requested that the parties address the *Younger* issue but proceeded to the merits at the urging of both parties).

## THE MERITS

### THE AGGRAVATED BATTERY CHARGE AGAINST LEE DAVID PONCHO

The jurisdictional dispute over this offense is governed by 18 U.S.C. § 1153. Section 1153 provides in pertinent part that

1. This Court is aware that, as an alternative ground, it could rely on a line of cases that might suggest that section 2283 does not bar injunctions of pending state court proceedings where Indian affairs are involved. The Court does not find that the cases are persuasive on this point, however, at least with respect to the individual plaintiffs. In several of the cases, the United States was the party seeking injunctive relief on behalf of the Indians. *See Alonzo v. United States,* 249 F.2d 189 (10th Cir.1957), *cert. denied,* 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958); *United States v. Dowden,* 194 F. 475 (C.C.E.D.Okla.1911); *United States v. Washington;* 459 F.Supp. 1020 (W.D.Wash.1978), *aff'd,* 645 F.2d 749 (9th Cir.1981). That section 2283 does not bar a suit for injunctive relief by the United States or one of its agencies in asserting a superior federal interest is well-established. *NLRB v. Nash-Finch Co.,* 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971); *Leiter Minerals v. United States,* 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). Thus, these cases already had a sound basis for entertaining the request for injunctive relief without the necessity of resorting to a blanket exception to section 2283 for cases concerning Indian rights. Other decisions turn on grounds unrelated to the Indian affairs issues in the case. *See, e.g., Armstrong v.*

*Maple Leaf Apartments, Ltd.,* 508 F.2d 518 (10th Cir.1974) (pending state proceedings were administrative rather than judicial in nature). Some Ninth Circuit authority suggests that an Indian *tribe* asserting jurisdiction under 28 U.S.C. § 1362 possesses the same right to pursue injunctive relief against state action as does the United States. *See Moses v. Kinnear,* 490 F.2d 21 (9th Cir.1973) (the Puyallup Tribe was not barred from injunctive relief by the Tax Injunction Act). *See also Cayuga Indian Nation of New York v. Fox,* 544 F.Supp. 542 (N.D.N.Y. 1982). Assuming the validity of this construction of section 1362, injunctive relief against pending state criminal proceedings would have been appropriate here only upon the successful intervention of the rightful Coushatta Tribe of Louisiana. But, absent intervention by the United States or a duly-recognized tribe, the Court feels that the better rule is that section 2283 bars an injunction of pending state court proceedings where only individual tribe members raise an Indian affairs question. *Cf. Amalgamated Clothing Workers v. Richman Bros.,* 348 U.S. 511, 516, 75 S.Ct. 452, 455, 99 L.Ed. 600 (1955) (section 2283 constitutes a "clear-cut prohibition qualified only by specifically defined exceptions").

"[a]ny Indian who commits against the person ... of another Indian or other person ... assault with a dangerous weapon ... within the Indian country, shall be subject to the same laws and penalties as all other persons committing [the offense], within the exclusive jurisdiction of the United States." An assault with a dangerous weapon charge under section 1153 is defined and punished in accordance with 18 U.S.C. § 113(c). *United States v. Addison*, 633 F.2d 861 (10th Cir.1981); 18 U.S.C. § 1153. In *United States v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), the Supreme Court held that a state does not have jurisdiction over an offense that is subject to federal prosecution under section 1153. 437 U.S. at 651–54, 98 S.Ct. at 2550–51; *see also Solem v. Bartlett*, — U.S. —, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (same rule); *Seymour v. Superintendent*, 368 U.S. 351, 359, 82 S.Ct. 424, 429, 7 L.Ed.2d 346 (1962) (same). As there is no substantive difference between an aggravated battery charge under La.R.S. 14:34 and an assault with a dangerous weapon charge under 18 U.S.C. § 113(c),[2] the sole remaining question in regard to state jurisdiction over the charge against Poncho is whether the alleged offense was committed "within the Indian country" under section 1153.

The land on which the offense allegedly occurred is a tract of approximately twenty acres situated in Allen Parish. The parcel was donated to the United States of America, in trust for the Coushatta Indian Tribe of Louisiana, by David L. Garrison, Jr. on July 2, 1976. The Secretary of the Interior, acting through the Bureau of Indian Affairs, accepted this donation and thereby acquired the property for the United States in trust for the Tribe. The acquisition of the land by donation is clearly authorized by section 5 of the Indian Reorganization Act of 1934, 48 Stat. 985, codified at 25 U.S.C. § 465. There is no indication in the record, however, that the Secretary proclaimed the land to be a reservation under section 7 of the Act, 48 Stat. 986, codified

at 25 U.S.C. § 467. Thus, the specific question presented here is whether land held in trust by the United States for a recognized Indian tribe but not proclaimed to be a reservation by the Secretary of the Interior constitutes "Indian country" for purposes of criminal jurisdiction under section 1153.

One statutory definition of "Indian country" under section 1153 includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation...." 18 U.S.C. § 1151(a). Although this Coushatta land has not been proclaimed to be a reservation pursuant to 25 U.S.C. § 467, existing jurisprudence indicates that the land should nonetheless be considered as a "reservation" for the purposes of federal criminal jurisdiction. In *United States v. John, supra*, Congress had directed several federal purchases of land for the Mississippi Choctaw Indians between 1918 and 1932. In 1939, Congress passed an Act providing that these lands would be held by the United States in trust for the Mississippi Choctaw. The Secretary of the Interior officially proclaimed these lands to be a reservation in 1944. In holding that the Choctaw land was Indian country, the *John* Court gave a strong indication that the act of holding the land in trust for the Indians, rather than the official proclamation of reservation status by the Secretary, was the critical fact for achieving reservation status under section 1151(a):

The Mississippi lands in question here were declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi Choctaw Indians who were at that time under federal supervision. There is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a "res-

---

**2.** *Compare United States v. Guilbert*, 692 F.2d 1340 (11th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983), *with State v. Trahan*, 416 So.2d 65 (La.1982).

ervation," at least for the purposes of federal criminal jurisdiction at that particular time. *See United States v. Celestine,* 215 U.S. 278, 285 [30 S.Ct. 93, 94, 54 L.Ed. 195] (1909). But if there were any doubt about the matter in 1939 when, as hereinabove described, Congress declared that title to lands previously purchased for the Mississippi Choctaws would be held in trust, the situation was completely clarified by the proclamation in 1944 of a reservation and the subsequent approval of the constitution and bylaws adopted by the Mississippi Band. 437 U.S. at 649, 98 S.Ct. at 2549. The quoted passage is undeniably *dicta* on the question presented here, yet it is also undeniably powerful in its suggestion that the Coushatta land should be considered Indian country. Such a holding would accord with earlier case law,[3] as well with the "principal test"[4] of whether the land "had been validly set apart for the use of Indians as such, under the superintendance of the Government."[5] The Court therefore holds that the Coushatta land is "Indian country" under section 1151, for purposes of federal criminal jurisdiction under section 1153.[6]

■ As the alleged offense falls exclusively within federal jurisdiction, the State of Louisiana has no jurisdiction to prosecute Lee David Poncho for the aggravated battery allegedly committed on the land held in trust by the United States for the Coushatta Tribe of Louisiana.*

## THE ATTEMPTED SECOND DEGREE MURDER CHARGE AGAINST HILTON LANGLEY

■ Jurisdiction over this charge is also governed by section 1153. The section lists "assault with intent to commit murder" as another of the fourteen major offenses subject to exclusive federal jurisdiction when committed by an Indian in Indian country. This offense is defined and punished under 18 U.S.C. § 113(a). The affidavit that accompanied the warrant for the arrest of Hilton Langley for attempted second degree murder alleged that he shot at one Rodrigue John with a rifle with the intent to murder John. This allegation states an offense under 18 U.S.C. § 113(a). *Compare United States v. Guilbert,* 692 F.2d 1340, 1343 (11th Cir.1982) ("assault" under the section encompasses both battery and attempted battery) *with Nixon v. United States,* 352 F.2d 601 (5th Cir.1965) (a deck hand who shot and wounded another deck hand was guilty of assault with intent to commit murder). Thus, in line

---

3. *Cf. United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938) (land purchased by the United States to provide for needy Indians in Nevada and to assist them in establishing a permanent settlement was "Indian country" within the meaning of 25 U.S.C. § 247, which permits forfeiture of automobiles used to carry intoxicants into Indian country).

4. *United States v. John,* 437 U.S. at 648, 98 S.Ct. at 2548.

5. *United States v. Pelican,* 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914).

6. The decision in *Cheyenne-Arapaho Tribes v. Oklahoma,* 618 F.2d 665 (10th Cir.1980) also supports the holding here. That case is distinguishable, however, because an Act of Congress declared that the Cheyenne-Arapaho trust lands were "subject to all provisions of existing law applicable generally to Indian reservations." 618 F.2d at 668.

A second statutory definition of "Indian country" could conceivably apply in this case. Section 1151(b) alternatively defines "Indian country" as "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state...." This definition is relied upon in *United States v. McGowan,* 302 U.S. 535, 538, 58 S.Ct. 286, 287, 82 L.Ed. 410 (1938), and *United States v. Sandoval,* 231 U.S. 28, 46, 34 S.Ct. 1, 5, 58 L.Ed. 107 (1913). The Court is unable to determine from the cited cases and the record in this case whether this second definition of "Indian country" is satisfied here.

* Subsequent to rendering the written opinion in this matter, the Court obtained a copy of the official proclamation of the Secretary of the Interior establishing the Coushatta land as a reservation pursuant to 25 U.S.C. § 467. *See* Proclamation of May 27, 1975, 40 Fed.Reg. 24220 (1975). Under section 1151(a) and the *John* case, the land is therefore "Indian country" for all purposes, including those concerning federal criminal jurisdiction, without regard to the analysis in the text. The statements in the text, to the effect that land held in trust by the Government for a recognized Indian tribe constitutes "Indian country" for purposes of federal criminal jurisdiction regardless of whether the land is officially proclaimed to be a reservation by the Secretary, are no longer necessary to this decision and therefore must be considered as dicta.

with the foregoing discussion, this offense allegedly committed in Indian country, falls exclusively within federal jurisdiction under section 1153.

## THE GAMBLING CHARGES

The affidavits that accompany the state warrants for arrest on gambling operations charges allege that the plaintiffs had been operating blackjack, pull-tabs, roulette wheels and similar games and that they had been conducting unlicensed bingo games in which non-Indians were allowed to participate. The offenses were allegedly committed by members of the Coushatta Tribe on the land held in trust for the Tribe. The Court would have preferred to approach the question of state criminal jurisdiction over these activities in terms of federal legislative pre-emption as was done with section 1153 and *United States v. John.*[7] Yet it is not entirely clear whether the alleged activities involved here are subject to federal prosecution; nor is it clear which federal statute might provide the appropriate basis for prosecution.[8] These questions need not be resolved here, however, and the Court specifically declines to express an opinion as to whether the alleged gambling activities and bingo operations in the instant case would be subject to federal prosecution if conducted in Indian country or in federal enclaves. The question that remains is whether principles that operate without resort to federal statutes or treaties concerning Indian affairs pre-empt state criminal jurisdiction over these alleged gambling and bingo activities.

As the matter stands, it must be assumed that the gambling offenses are not subject to prosecution under a statute vesting jurisdiction exclusively with the federal sovereign and that the Coushatta Tribe does not have a treaty with the United States which specifically reserves the right to be free of state criminal jurisdiction in the trust territory. The Court has not found a Supreme Court or Circuit level opinion on point, such as on direct review of a state court conviction or on a writ of *habeas corpus,* that holds that states have no criminal jurisdiction over an Indian offense committed in Indian country in this situation. The holding in *United States v. John* regarding crimes subject to prosecution under section 1153 stands as a strong suggestion that states have no jurisdiction over other crimes committed by Indians in Indian country, but that holding is based in part on the legislative history pertaining specifically to section 1153. *See* 437 U.S. at 651 n. 22, 98 S.Ct. at 2250 n. 22. Yet the issue raised here does not arise on an entirely empty slate, for the *John* holding is undoubtedly supported as well by a longstanding doctrine in federal Indian law, the doctrine of Indian sovereignty. A brief examination of the contours of this doctrine will indicate whether the activities alleged here are subject to state criminal jurisdiction.[9]

7. *Cf. DeCanas v. Bica,* 424 U.S. 351, 356–57, 96 S.Ct. 933, 936–37, 47 L.Ed.2d 43 (1976) (federal legislation pre-empts even harmonious state regulation when either (1) the nature of the subject matter permits no other conclusion, or (2) Congress has unmistakably manifested an intent to "occupy the field").

8. *Compare* 18 U.S.C. § 13 (state criminal law applies as surrogate *federal* law in federal enclaves for offenses that are not otherwise punishable under federal law) *and* 18 U.S.C. § 1152 (federal enclave laws apply in Indian country to offenses committed by Indians) *and United States v. Sosseur,* 181 F.2d 873 (7th Cir.1950) (Wisconsin criminal law against conducting gambling operations applied as surrogate federal law in Wisconsin Indian country through sections 13 and 1152) *with* 18 U.S.C. § 1955 (operation of a gambling enterprise that violates the law of the state in which it is conducted constitutes a federal offense) *and United States v. Farris,* 624 F.2d 890 (9th Cir.1980), *cert. de-*nied, 449 U.S. 1111, 101 S.Ct. 919, 66 L.Ed.2d 839 (1981) (section 1955 applied to Indian operators of Indian country casinos) (one judge dissenting and one judge concurring on limited grounds) *and with* 15 U.S.C. § 1175 (operation or use of gambling devices in Indian country constitutes a federal offense) *and United States v. Blackfeet Indian Reservation,* 369 F.Supp. 562 (D.Mont.1973) (applying section 1175 to Indian gambling operations). The brief explanatory parentheticals to the foregoing citations of course gloss over the numerous questions of interpretation that arise in the application of each of the statutes cited.

9. Technically, the definition of "Indian country" in 18 U.S.C. § 1151 is made applicable only in regard to its uses in Chapter 53 of Title 28 and in those statutes, such as 15 U.S.C. § 1175, that refer specifically to the section 1151 definition. Yet the Court proceeds on the fairly secure premise that no significant distinction exists be-

In its most extreme formulation, the Indian sovereignty doctrine provided that state laws are not applicable to tribal Indians in Indian country except to the extent that Congress has expressly provided that state law shall apply.[10] This absolute principle has been traditionally based on notions of inherent Indian sovereignty and the apparent assumption that the Indian commerce clause, U.S. Const. art. I, § 8, cl. 3, operating in its dormant state, pre-empted all state regulation that affected tribal Indians in Indian country.[11] The doctrine has undergone considerable evolution however, and recent decisions suggest a shift away from a rigid bar to state jurisdiction based on inherent Indian sovereignty toward flexible standards derived from general federal pre-emption law.[12] In light of these developments, the doctrine is perhaps best reflected in the statement that state laws are not applicable in Indian country where those laws infringe on the right of tribal Indians to make their own laws and be ruled by them, unless Congress has expressly provided that state law shall apply.[13] That is, Indian tribes retain those attributes of their original sovereignty which are not inconsistent with their dependent status and which have not been divested by federal treaty or statute.[14]

■ Although recent decisions may raise doubt as to the ultimate extent of inherent Indian sovereignty in other contexts,[15] it nonetheless has been considered as axiomatic that the right of tribal Indians to make and enforce their own laws includes the power to exercise jurisdiction over offenses committed by Indians in Indian territory. Indeed, Congress, in enacting legislation either asserting federal jurisdiction over Indian crimes[16] or permitting the exercise of state jurisdiction over Indian

tween "Indian country" for purposes of federal criminal jurisdiction under section 1151 and "Indian country" for purposes of determining whether a state has jurisdiction over a crime that is not subject to prosecution under a federal statute that incorporates the section 1151 definition. The statutory definition is based on several Supreme Court decisions that interpreted the term as a matter of federal common law. *See United States v. John,* 437 U.S. at 648 and 649 n. 18, 98 S.Ct. at 2548 and 2549 n. 18. These decisions often assumed that, in defining the extent of Indian country for purposes of federal criminal jurisdiction, they were also defining the limits on state jurisdiction. *See, e.g., Donnelly v. United States,* 228 U.S. 243, 33 S.Ct. 449, 458–59, 57 L.Ed. 820 (1913). Moreover, use of the section 1151 definition has not been restricted to questions concerning jurisdiction under the various federal criminal statutes referred to earlier; the Supreme Court has recognized that the definition generally applies to questions of civil jurisdiction as well. *See, e.g., DeCoteau v. District County Court,* 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 1084 n. 2, 43 L.Ed.2d 300 (1975). Finally, the Court can see no reason to apply a different definition in resolving the question presented here and further finds that no benefit would follow from doing so. Use of a different definition of "Indian country" to resolve the issue raised here would only complicate the law in this area unnecessarily.

10. *See McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 170–71, 93 S.Ct. 1257, 1261, 36 L.Ed.2d 129 (1973); *Worcester v. Geor-*

*gia,* 31 U.S. (6 Pet.) 515, 561–62, 8 L.Ed. 483 (1832).

11. *See generally* Clinton, *State Power over Indian Reservations: A Critical Comment on Burger Court Doctrine,* 26 S.D.L.Rev. 434 (1981).

12. *See McClanahan,* 411 U.S. at 171–72, 93 S.Ct. at 1261; *see also Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 165–66 n. 1, 100 S.Ct. 2069, 2087–88 n. 1, 65 L.Ed.2d 10 (1980) (Brennan, J., concurring in part and dissenting in part).

13. *See, e.g., Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959).

14. *Washington v. Confederated Tribes,* 447 U.S. at 152, 100 S.Ct. at 2080; *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978). The absence of a specific reservation of a sovereign power in a treaty should not be a material fact under the Indian sovereignty doctrine. As the doctrine is framed in the jurisprudence, the critical question is whether a treaty has *divested,* as opposed to granted or reserved, an inherent sovereign right that is not otherwise inconsistent with the tribe's dependent status.

15. *See* Clinton, *supra* note 11, at 439–46; Note, *Rethinking the Trust Doctrine in Federal Indian Law,* 98 Harv.L.Rev. 422, 438–39 (1984).

16. *E.g.,* 18 U.S.C. §§ 1152, 1153.

**344**

crimes,[17] has acted consistently on the express assumption that states have no criminal jurisdiction over offenses committed by Indians in Indian country absent a Congressional grant of such power.[18] This assumption has been just as consistently echoed in Supreme Court jurisprudence.[19] This prevailing legislative and judicial presumption can only reflect a mutual understanding that a tribe's "right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions,"[20] and that this retained sovereignty, by virtue of the negative implications of the Indian commerce clause, pre-empts state jurisdiction over offenses committed by tribal Indians in Indian country.[21] The Court therefore holds that Louisiana cannot assert criminal jurisdiction over the alleged gambling activities involved here.[22]

During the course of this litigation, the defendants have distinguished between unlicensed bingo and other forms of gambling, practically conceding a lack of jurisdiction over the unlicensed bingo but urging that state jurisdiction exists over the other gambling offenses. The defendants find support for this position in *Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (5th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982). *Butterworth* held that Florida could not apply its law against gambling operations to unlicensed bingo by Indians in Indian country because the state licensing scheme rendered the law "civil/regulatory" rather than "criminal/prohibitory." The defendants argue that Louisiana has jurisdiction over the other gambling offenses here because Louisiana does not license these forms of gambling and that La.R.S. 14:90 is therefore a permissible "criminal/prohibito-

---

**17.** *See* Act of Aug. 15, 1953, Pub.L. No. 83–280, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–1326, 28 U.S.C. § 1360) [hereinafter "Public Law 280"]. Public Law 280 extends criminal and limited civil jurisdiction to certain listed states over certain specified areas of Indian country. The original act allowed other states to assume this jurisdiction by state legislative action, *see* Act of Aug. 15, 1953, ch. 505, § 7, 67 Stat. 590, but this particular provision was repealed in 1968. *See* Act of Apr. 11, 1968, Pub.L. No. 90–284, § 403(b), 82 Stat. 79. Louisiana did not elect to assume jurisdiction under Public Law 280 as there was no Indian country in the state during the time that it could have made a viable election.

**18.** *See, e.g.,* H.R.Rep. No. 848, 83d Cong., 1st Sess., 5–6 (1953) (pertaining to Public Law 280), *quoted in Bryan v. Itasca County*, 426 U.S. 373, 379–80, 96 S.Ct. 2102, 2106–07, 48 L.Ed.2d 710 (1976).

**19.** *See, e.g., Solem v. Bartlett*, —— U.S. ——, —— n. 2, 104 S.Ct. 1161, 1163 n. 2, 79 L.Ed.2d 443 (1984) (in *dicta,* the Court stated that state jurisdiction is limited in Indian country to crimes by non-Indians against non-Indians and victimless crimes by non-Indians, absent an assumption of jurisdiction under Public Law 280); *Washington v. Yakima Indian Nation*, 439 U.S. 463, 470–71, 99 S.Ct. 740, 746, 58 L.Ed.2d 740 (1979) (similar *dicta*); *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959) (same); *Donnelly v. United States*, 228 U.S. 243, 33 S.Ct. 449, 458–59, 57 L.Ed. 820 (1913) (same); *United States v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 1113–14, 30 L.Ed. 228 (1886) (same).

**20.** *United States v. Wheeler*, 435 U.S. 313, 322, 98 S.Ct. 1079, 1085, 55 L.Ed.2d 303 (1978). Significantly, *Wheeler* recognizes tribal sovereignty as a matter of inherent retained powers rather than as merely an aspect of federal sovereignty that has been delegated to the tribes by Congress. *See* 435 U.S. at 322–23, 98 S.Ct. at 1085–86. *Wheeler* therefore lends support to the view that residual Indian sovereignty, operating through the Indian commerce clause, can pre-empt certain elements of state jurisdiction even in the absence of federal treaty obligations or legislation. *See also McClanahan,* 411 U.S. at 172, 93 S.Ct. at 1262 n. 8.

**21.** *Cf. Oliphant,* 435 U.S. at 206, 98 S.Ct. at 1019 (in holding that Indian tribal courts do not have jurisdiction to try non-Indians for offenses committed in Indian country, the Court placed considerable reliance on the commonly shared presumption to this effect by all three of the branches of government).

**22.** The fact that the Coushatta Tribe of Louisiana has not enjoyed continuous federal recognition and supervision from the present back into the 1800's and the fact that the Coushattas have only recently acquired their "Indian country" do not appear to be material ones here. *Cf. United States v. John,* 437 U.S. at 652–53, 98 S.Ct. at 2550–51 (gaps in federal recognition and supervision of the Mississippi Choctaws did not destroy federal power to oust state jurisdiction over the affairs of the Choctaws in Indian country acquired in the twentieth century).

ry" regulation in regard to these particular offenses.

■ *Butterworth* is distinguished from the instant case in a quite fundamental respect, however. In Public Law 280, Congress granted states the right to legislatively assume criminal and limited civil jurisdiction over Indian tribes.[23] Florida "opted in" to Public Law 280. In *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court held that Public Law 280 extended civil jurisdiction only to the extent necessary to resolve civil disputes concerning Indians and that the act therefore did not confer civil regulatory power · upon the states. The distinction relied upon in *Butterworth* was therefore quite pertinent there. Louisiana, on the other hand, has never elected to assume jurisdiction under Public Law 280. The distinction between "civil/regulatory" and "criminal/prohibitory" law, and its application in *Butterworth*, is accordingly wholly irrelevant in the instant suit. Absent a timely assumption of jurisdiction under Public Law 280, Louisiana jurisdiction over *all* of these gambling offenses allegedly committed by Indians in Indian country is pre-empted under the Indian sovereignty doctrine and the negative implications of the Indian commerce clause.

■ One last point remains for discussion. The parties have asked the Court to address the specific question of whether Louisiana can apply La.R.S. 14:90 to Indians conducting an unlicensed bingo game in Indian country to the extent that they allow non-Indians to participate. *Butterworth* is controlling on this particular point and mandates the conclusion that the state cannot apply the statute to even this limited extent. The Florida statute involved in *Butterworth*, like the Louisiana statute involved here, proscribed the *operation* of a gambling enterprise, not the *playing* of the game by a customer at the enterprise. In this circumstance, where the criminal law is directed at the Indian operator rather than the non-Indian player, the Fifth Circuit held that the state could not apply its law to the activity merely because non-Indians were involved. 658 F.2d at 316–17. The state presently has no more basis for preventing non-Indians from playing bingo on the Coushatta trust territory than it does for prohibiting non-Indians from playing at any bingo hall that is immune from criminal prosecution under the state licensing law.

Accordingly, the Court having concluded that the defendant Allen Parish officials do not have jurisdiction to prosecute these offenses, the plaintiffs' petition for preliminary injunctive relief is hereby GRANTED.

## THE INTERVENTION

In granting the plaintiffs petition for preliminary injunctive relief, the Court has indirectly afforded the party seeking intervention, the "Coushatta Tribe of Louisiana," the substance of the relief it seeks. Under the Court's ruling, entry of a declaratory judgment and a permanent injunction await only a formal motion and the provision of proper notice to the defendants. No issues of material fact remain in this regard. There is therefore no need for this Court to resolve the controversies surrounding the attempt by this entity to intervene in this action. Accordingly, the petition for intervention is DISMISSED as moot.

## POSTSCRIPT

The members of the Coushatta tribe opposing the intervention have expressed a concern that the injunction issued here will effectively deprive them of police protection heretofore provided by state officials. The Court is not unmindful that its application today of abstract notions of Indian sovereignty, which are intended to be for the benefit of Indians, in practical effect harms the Tribe by depriving its members of this protection on the trust territory. This gap in protection will have to be filled by the creation of a tribal police force or by assignment of additional federal law enforcement officials to this area. There is another solution to this problem, however.

---

**23.** See note 17, *supra*.

Under 25 U.S.C. § 1321(a), a state may assume jurisdiction over offenses committed by or against Indians in Indian country with the consent of the tribe occupying the Indian country. Of course, in dealing with the State, the Coushatta Indians may have to take the bitter, state jurisdiction over "victimless" crimes, with the sweet, state protection from crimes against persons and property, but that is a matter to be worked out between the Coushattas and the State of Louisiana. The Court merely suggests this procedure as an alternative solution to the law enforcement problem on the trust territory.