**NEW YORK NEWS, INC., Plaintiff,**

v.

**STATE OF NEW YORK, The New York Department of Labor, Thomas Hartnett, individually and as Commissioner of Labor of the State of New York Department of Labor, Martin F. Scheinman, Fred L. Denson and Thomas F. Carey, Defendants.**

No. 90 Civ. 5050 (KTD).

United States District Court,
S.D. New York.

Aug. 11, 1990.

R. Eddie Wayland, James A. Purdy, King & Ballow, Nashville, Tenn., and Gregory I. Rasin, Jackson, Lewis, Schnitzler & Krupman, New York City, for plaintiff.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Jane Lauer Barker, Faye Kessin Lewis and Harvey Golubock, Asst. Attys. Gen., of counsel.

## OPINION AND ORDER

CONBOY, District Judge:

Plaintiff New York News, Inc. ("the Daily News") brought this action by order to

show cause, seeking, *inter alia*, a preliminary injunction enjoining the defendants, the State of New York, the New York Department of Labor, Thomas Hartnett, Martin F. Scheinman, Fred L. Denson and Thomas F. Carey, from convening a Board of Inquiry, pursuant to Sections 800 through 805 of New York Labor Law (McKinney's 1988), to investigate the ongoing labor dispute between the Daily News and ten labor unions. For the reasons set forth below, the motion for a preliminary injunction is granted.

## BACKGROUND

The Daily News, which publishes the *New York Daily News*, a generally-circulated newspaper, employs over 2,500 people, most of whom are represented by one of ten labor unions ("the Unions"). The collective bargaining agreements ("CBA's") between the Daily News and the Unions expired on March 30, 1990. Since that time, the Daily News has engaged in numerous separate bargaining sessions with each of the Unions, in an effort to reach new CBA's. The Federal Mediation and Conciliation Service ("FMCS") is participating in the Daily News' negotiations with four of the unions, each of whom requested FMCS mediation. To date, no new CBA's have been reached.

By order of July 26, 1990, defendant Thomas Hartnett, the Commissioner of Labor of the State of New York ("the Commissioner") established a Board of Inquiry ("the Board"), pursuant to Labor Law §§ 800 *et seq.*, which empowers the Commissioner to appoint a Board of Inquiry "[w]here any strike, lockout, or other labor dispute exists or is apprehended, ... for the purpose of inquiring into the causes and circumstances of the dispute ... and report thereon to the commissioner." Empanelling a Board of Inquiry, the Commissioner hoped, would provide a forum in which the labor dispute could be voluntarily resolved through fact-finding, discussion, mediation and conciliation. Affidavit of Thomas F. Hartnett, sworn to on August 7, 1990 ("Hartnett Aff.") ¶ 2. The Commissioner's order was premised, as required by Labor Law § 800, upon a certification from Hezekiah Brown, the Chairman of the New York State Mediation Board ("SMB"), that "in the [SMB's] opinion efforts to effect a voluntary settlement of the dispute have been unsuccessful."

Because of the economic consequences of a strike or lockout for both the Daily News and its employees, Brown has been following the dispute closely for months. In February of 1990, Brown called Edward Gold, Director of Labor Relations at the Daily News, and offered the services of the SMB. Affidavit of Hezekiah Brown, sworn to on August 8, 1990 ("Brown Aff."), ¶ 4. Gold declined the offer of assistance, indicating that negotiation meetings were scheduled and that, in his opinion, progress was being made. *Id.* However, the Unions, when contacted by Brown, apparently did not agree that much progress was being made. *Id.* Brown called the Daily News and the Unions periodically to reiterate his offer of assistance. *Id.* ¶ 5. Brown also contacted Brian Flores, then FMCS district director in New York City, about the Daily News negotiations, and told Flores of his offer to the parties to assist in their bargaining efforts. *Id.* Flores and Brown agreed to keep each other informed about the negotiations. *Id.*

In July of 1990, the Commissioner, apparently with an eye toward empanelling a Board of Inquiry, asked Brown to meet with the Daily News and the Unions to evaluate the status of the negotiations. *Id.* ¶ 6. To ascertain whether and how far the parties had progressed in their negotiations, Brown had discussions with each of the ten unions and with the Daily News, *id.*, and received reports from all of the parties. *Id.* ¶ 7. Brown found that "[w]hile certain unions had reached agreement with the Daily News on a few items, the parties were still far apart on the major issues which divided them," including management rights, job security, fringe benefits and hours. *Id.*

According to Brown, there have already been some layoffs at the Daily News, and the Daily News has undertaken strike preparations by recruiting replacement workers

and establishing a training facility in New Jersey. *Id.* ¶ 8. With respect to the parties' bargaining positions, Brown notes that the "Daily News is asking for many significant and substantial changes in the contracts, ... which the unions saw as a 'retrogressive' attempt to win unnecessary 'give-backs'." *Id.* Brown does not elaborate upon the Unions' positions or actions.

Based on his observations and investigation, Brown concluded, in a letter to the Commissioner, "that efforts to effect a voluntary settlement of the dispute have been unsuccessful." Letter, dated July 26, 1990, from Hezekiah Brown to Thomas Hartnett (attached as Exhibit A to Brown Aff.) ("Certification Letter"). In addition to citing the primary points in dispute, also outlined above, Brown emphasized the "significant public interest in the parties' dispute," noting that "the negotiations may impact upon government efforts to promote appropriate economic development within the state, as well as the state's interest in protecting its workers in various regards." *Id.* Thus, Brown "recommend[ed] that a board of inquiry be asked to investigate the parties' ability and willingness to enter into mediation, in addition to the economic issues which are the underlying cause of the dispute." *Id.*

The Commissioner's July 26, 1990 order, attached as Exhibit B to the Complaint, requires the Board to investigate the circumstances of the dispute, including the parties' respective positions on subjects of bargaining. In addition, the order identifies six areas of inquiry, which include: how management rights need to be changed to allow the Daily News to continue profitably without impairing the basic rights of the employees; what the parties believe are appropriate manning levels; what changes in health insurance and pension benefits the parties desire; and whether the denial of management's overall proposals would lead to the shut down of the Daily News. Among the Board's powers are the power to subpoena witness, documents, contracts, papers and other evidence it may deem relevant to the dispute and the power to administer oaths and take testimony. The order directs the Board to issue a final report, which, unless the dispute is settled, shall include recommendations as to terms of settlement. Although the Board may hold hearings either in public or in private, the final report will be made public.

In a letter dated July 30, 1990, defendant Martin F. Scheinman, Chairman of the Board of Inquiry, informed the Daily News and representatives of each of the Unions that the first meeting of the Board would be held on Monday, August 6, 1990, at 11:00 a.m. Complaint, Exhibit C. The purpose of the meeting was to establish the procedures and ground rules for presentations to the Board. *Id.*

On August 1, 1990, the Daily News brought this action, seeking to prevent the defendants from convening the Board. Although the Unions apparently do not oppose the implementation of a Board of Inquiry, the Daily News is vehemently opposed to it. The Daily News argues in essence that the Board constitutes an impermissible interference by a State into the free and voluntary collective bargaining process between private parties which is not tolerated by federal labor law principles. Moreover, the Daily News asserts that its position in the negotiations and the bargaining process itself will be irreparably harmed by the Board's inquiry.

At a conference before the Court on August 1, the Commissioner agreed to postpone the first meeting of the Board of Inquiry for one week, from August 6, 1990, to August 13, 1990, to enable the Court to receive complete and detailed memoranda and affidavits on the issues presented in this action, and to hold a hearing on the matter. We received a supplemental memorandum of law and affidavits from the Daily News on Monday, August 6, 1990, and a memorandum of law and supporting affidavits from the State on Thursday, August 9, 1990.[1] On August 10, 1990, we

1. We also received, on Thursday, August 9, 1990, a declaration from James Hoge, President and Publisher of New York News, Inc., and on Friday, August 10, 1990, affidavits from Vincent

# 168

held a hearing, which consisted solely of oral argument from both sides. The following discussion embodies our findings of fact and conclusions of law. .

## DISCUSSION

To prevail in its application for a preliminary injunction, staying governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the Daily News must demonstrate (a) irreparable harm and (b) a likelihood of success on the merits. *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989).

### A. *Irreparable Harm*

 Irreparable harm is an injury for which there is no adequate remedy at law. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The Daily News argues that, if the Board is allowed to go forward, "the context, fabric and face of the negotiations between the Daily News and the Unions would be irreversibly changed." Supplemental Memorandum of New York News, Inc., in Support of Its Application for a Temporary Restraining Order and Preliminary Injunction ("Supp. Mem.") at 41. The State responds first that the Daily News will not be harmed by the Board's inquiry, which is "wholly separate and independent" from the collective bargaining process, Memorandum of Defendants in Opposition to Plaintiff's Application for a Temporary Restraining Order and Preliminary Injunction ("Def. Mem.") at 13, and second that, even if the collective bargaining process is affected, any harm to the Daily News is not irreparable "because there is nothing irreversible in the process." Transcript of Hearing ("Tr.") at 62. We find that the Daily News will be irreparably harmed if the Board proceeds with its investigation.

First, as the Daily News asserts, far from being "wholly separate and independent" from the collective bargaining process, the investigation will destroy any at-

mosphere of frank and open discussions. As Edward W. Gold, Director of Labor Relations for New York News, Inc., explains, ·with a Board of Inquiry,

> There is no secrecy or confidences that can be shared. There can be no candid discussions to explore, whether a mutually agreeable alternative exists or whether a concession in one area may elicit a concession by the other side in another. The Board of Inquiry will formalize the negotiations. It will transform private voluntary collective bargaining into a public forum and event.

Declaration of Edward W. Gold, executed on August 5, 1990 ("Gold Decl."), ¶ 16. Compelled to produce documents and testify under oath, setting forth their bargaining positions, the parties will be unable to "be fluid and change positions or make concessions without embarrassment or losing face." *Id.* ¶ 17.

Second, as the Daily News asserts, the negotiations will be adversely affected by the public nature of the Board's proceedings. The Daily News could be forced, through the production of documents or testimony under oath, to divulge confidential or proprietary information. For example, questions about the Daily News' "bottom line" on staffing requirements, benefits, or independent contractors, would call for disclosure of information which "would cause severe damage to the competitiveness of the Daily News in its dealings with the unions, individually and collectively, and possibly with its business competitors." Gold Decl. ¶ 19.

Incredibly, the State suggests that the Daily News will not be forced to disclose anything because the Board may choose not to use its subpoena power. Def. Mem. at 15. Obviously, the Board could not carry out its duties if it did not obtain information from the non-cooperating Daily News by subpoena. As the State concedes, "[i]f the Board is going to be successful

---

Tese, Commissioner of Economic Development for the State of New York, and Thomas Hartnett, in response to Hoge's affidavit. Because these submissions are concerned primarily with the propriety of the Commissioner's decision to

establish a Board of Inquiry pursuant to Labor Law § 800, a question of state law which we do not address and which is not before us, we need not consider them.

and the Daily News refuses to participate," the Board will have to use its subpoena power. Tr. at 30. A subpoena issued by the Board is "regulated by [New York's] civil practice law and rules," Labor Law § 803, meaning that the Board may move in New York State Supreme Court to compel the production of document or giving of testimony sought by the subpoena CPLR § 2308(b). Refusal to comply may result in a contempt proceeding. *Id.*

The State also argues that the Daily News will be protected by the provisions for confidentiality in Board proceedings. Although the Board is required by statute to keep testimony and documents confidential if it finds that the information is not otherwise available to the public, Labor Law § 804, there can be no guarantee that witnesses appearing before the Board will keep the proceedings confidential. Furthermore, while the Commissioner has agreed to make only the final report and recommendations public, publication of that report alone will put broad *public* pressure on the parties to reach the particular agreement advocated by the Board. As the State admits, the public pressure "can't be ignored. Obviously that is *the point of the Board of Inquiry.*" Tr. at 44 (emphasis added). After the report is issued, and the public presence is injected into the dispute, the parties will no longer be able to bargain freely, in a private negotiation, even though the Board's recommendations are not "binding" on the parties. Indeed, the State has conceded that "political jawboning is a perfectly appropriate purpose of the statute." Tr. at 36.

This reality is at the core of the statute, as the legislative history confirms. The committee report provides:

> It is not intended that this board should have any sanction or penal powers, but rather that the procedure depend for its effectiveness upon the fact that the truth about the particular situation would be brought to public attention and that *public opinion would force the parties to seek a settlement.*

Report of the New York State Joint Legislative Committee on Industrial and Labor Conditions, No. 51 at 30 (1941) (emphasis added). Inevitably, we believe, this kind of public truth-finding process will lead to assessment of blame. Indeed, Brown, the Chairman of the SMB, recommended in his letter to the Commissioner that "a board of inquiry be asked to investigate the parties ability and *willingness* to enter into mediation." Brown Aff., Exhibit A (emphasis added).

Third, and perhaps even more troubling to the Daily News, it will inevitably be forced "to reveal information concerning its negotiation goals, strategies, tactics and settlement points." Gold Decl. ¶ 19. The State characterizes the Board as merely "a fact-finding body," Def. Mem. at 13, established to assess the parties' "positions," not their "strategies." Tr. 33. This is a distinction without meaning, because the positions of the parties are inseparable from their bargaining strategies. Thus, in revealing the "facts" that underlie their "positions," the parties will necessarily reveal their "strategies," just as the strategies in a poker game are revealed when the players are required to lay their cards face up on the table. Tr. at 7. As a result, the game—here, the process of collective bargaining—is destroyed.

Fourth, the Board's investigation will intrude upon, and destabilize, in practical terms, the ongoing negotiations between the parties. Indeed, as the Daily News points out, the negotiations have already been disrupted by proceedings involving the Board. According to Gold, when the media first reported that the State was considering the possible use of a Board of Inquiry, the President of the Pressman's Union stated during a negotiation session "that he did not want to schedule any further meeting until he knew what was going to happen with the Board of Inquiry." Gold Decl. ¶ 10. Since that time, at the insistence of the Daily News, talks have continued with the Printing Pressman's Union, but at a slower pace. *Id.* Another union, the Machinists Union, cancelled a negotiating session scheduled for August 3, 1990, "because of the pending proceedings before the Board of Inquiry." *Id.* ¶ 11. Although the business representative

of that union, Joseph Armao, now states that he "fully intends to continue to schedule meetings" with the Daily News, Affidavit of Joseph P. Armao, sworn to on August 8, 1990 ("Armao Aff."), ¶ 2, the disruption in the bargaining schedule between Armao's union and the Daily News has already occurred. Moreover, as the Board conducts its inquiry, subpoenaing documents and compelling testimony from witnesses, more disruptions are bound to occur, altering not only the bargaining schedules, but also the substance, direction, pace, efficiency, tenor and overall environment of the negotiations.

Based on the foregoing, we conclude that the Daily News will be harmed by the Board's inquiry, which will disrupt the negotiations and impact upon the positions of the parties. Given the public nature of the Board's proceedings, in particular its final report and recommendations, we further conclude that the damage to the free negotiation process caused by the Board's inquiry would be irreparable.

### B. Likelihood of Success on the Merits

■ The Daily News argues that Sections 800 through 805 of New York Labor Law, which provide for the establishment by the State of a board of inquiry, are preempted by the National Labor Relations Act ("NLRA"). It is beyond cavil that Congress, in enacting the NLRA, intended to regulate labor relations "to the full extent of its constitutional power under the Commerce Clause." *Amalgamated Bus Employees v. Wisconsin Employment Relations Board* 340 U.S. 383, 391, 71 S.Ct. 359, 363–64, 95 L.Ed. 364 (1951). Congress "occupied the field" of labor relations, leaving to the states only the power to regulate activities of "a merely peripheral concern of the Labor Management Relations Act" or conduct touching interests "deeply rooted in local feeling and responsibility," *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243–44, 79 S.Ct. 773, 778–79, 3 L.Ed.2d 775 (1959), meaning "conduct marked by violence and imminent threats to the public order." *Id.* at 247, 79 S.Ct. at 781.

In the context of labor relations, there are two types of preemption. Under the first preemption doctrine, set forth in *Garmon*, state laws or regulations are presumptively prohibited if they concern conduct that is actually or arguably prohibited or protected by the NLRA. *Id.* at 245, 79 S.Ct. at 779–80. Under the second doctrine, commonly referred to as "*Machinists* preemption," state laws or regulations may be preempted, even though their objects are neither prohibited nor protected under the NLRA, if they regulate an activity which was intended by Congress to be unregulated, "left 'to be controlled by the free play of economic forces.' " *Lodge 76, Int'l Ass'n of Machinists and Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976) (quoting *NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971)).

Under either doctrine, "conflict is the touchstone of preemption." *Garmon*, 359 U.S. at 250, 79 S.Ct. at 783 (Harlan, J., concurring). Thus, the central question is whether New York law providing for the establishment of a board of inquiry conflicts with federal labor law. The Daily News contends that the New York law conflicts with federal labor law because it will impair and impede the collective bargaining process between the Daily News and the Unions and will, directly or indirectly, inevitably force a particular result on the parties, thereby going to the heart of what Congress, in enacting the NLRA, intended to protect and leave unregulated.

One of the central concerns of the NLRA is "establishing an equitable process for determining terms and conditions of employment. . . ." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 753, 105 S.Ct. 2380, 2396, 85 L.Ed.2d 728 (1985). The Act is not interested, however, in dictating particular terms of the bargain that is struck when the parties are negotiating from relatively equal positions. *Id.* The NLRA simply does not permit governmental regulation or promulgation of the terms and conditions of employment. As the Supreme Court has summarized,

The object of [the NLRA] was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions. The basic theme of the Act was that through collective bargaining the passions, arguments, and struggles of prior years would be channeled into constructive, open discussions leading, it was hoped, to mutual agreement. But it was recognized from the beginning that agreement might in some cases be impossible, and it was never intended that the Government would in such cases step in, become a party to the negotiations and impose its own views of a desirable settlement.

*H.K. Porter Co., Inc. v. NLRB*, 397 U.S. 99, 104–105, 90 S.Ct. 821, 824, 25 L.Ed.2d 146 (1970). This is consistent with the legislative intent of Congress when the Act was initially promulgated. At that time, the Senate Committee on Education and Labor stated:

> The committee wishes to dispel any possible false impression that this bill is designed to compel the making of agreements or to permit governmental supervision of their terms. It must be stressed that the duty to bargain collectively does not carry with it the duty to reach an agreement, because the essence of collective bargaining is that either party shall be free to decide whether proposals made to it are satisfactory.

S.Rep. No. 573, 74th Cong., 1st Sess., 12 (1935). Thus, the role of the NLRB or any other authorized agency is to oversee or referee the collective bargaining process without dictating the results. The government " 'may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.' " *H.K. Porter*, 397 U.S. at 106, 90 S.Ct. at 825 (quoting *NLRB v. American National Insurance Co.*, 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952)).

Because of the coercive and pervasive effect the Board will have on the negotiations between the Daily News and the Un-

ions, we find, as have other courts, that the establishment of a board of inquiry under the circumstances such as these is preempted by the NLRA. *See Oil, Chemical & Atomic Workers Int'l Union v. Arkansas Louisiana Gas Co.*, 332 F.2d 64 (10th Cir. 1964) (*OCAW*); *General Elec. Co. v. Callahan*, 294 F.2d 60 (1st Cir.1961); *Rochester Telephone Corp. v. Levine*, 90 L.R.R.M. (BNA) 3032 (W.D.N.Y.1975); *Grand Rapids City Coach Lines, Inc. v. Howlett*, 137 F.Supp. 667 (W.D.Mich.1955). For example, in *OCAW*, the district court enjoined the Oklahoma State Board of Arbitration and Conciliation from investigating an ongoing labor dispute and making recommendations and findings. The Tenth Circuit affirmed, finding that the "State activity was clearly prohibited." *OCAW*, 332 F.2d at 66.

Similarly, in *General Electric*, the court enjoined the Massachusetts Labor Board from investigating labor negotiations between a company and some of its employees. The Massachusetts statute explicitly provided that the Board would publish a report finding which party was "responsible" or "blameworthy," 294 F.2d at 62, n. 1, and that the Board's recommendation would be binding for six months. *Id.* at 63, n. 2. Aside from this "limited direct coercive power," however, the court emphasized that

> the indirect coercive effect of its actions upon the parties to a labor dispute is by no means insubstantial. Mere participation in State Board hearings will surely have some tendency to solidify positions taken at the bargaining table thereby making it more difficult later to modify or abandon a stand taken on a bargaining issue in favor of an amicable settlement.

*Id.* at 67. The court concluded that the statutory purpose, "to coerce agreement by invoking official action to mold public opinion with respect to a labor dispute to the end of bringing the pressure of public opinion to bear to force a settlement," was contrary to the national policy of not coercing agreements. *Id.* Accordingly, "[t]he

conflict between state and federal policy is obvious." *Id.*

The State argues that, although the Board admittedly will have some effect on the negotiations, as is the statutory intent, Tr. at 53, this effect is not enough to require preemption. To the contrary, the State contends, New York law is consistent with references in the NLRA for state mediation boards. *See, e.g.,* 29 U.S.C. § 158(d)(3) (both federal and state mediation services to be notified in case of pending resort to economic weapons). The State's argument is based primarily on its characterization of the Board's inquiry as a benign, conciliatory process intended to facilitate negotiation rather than to coerce a particular result. As we have determined, this characterization is inaccurate. The Board is not a voluntary mediation service like the FMCS. Its powers are inherently coercive, and were intended to be so, and its report will inevitably, and is intended to, force the parties to reach a particular agreement, in accordance with the public pressure generated by the Board's report and recommendations.

The State also contends that the Board is not preempted under either the *Garmon* or *Machinists* preemption doctrines. The State suggests that, because the parties are not bound by the Board's recommendations, the Board does not regulate their collective bargaining efforts. As we have observed, however, the Board is not merely a fact-finding body. Its actions will have, and are intended to have, a real effect on the negotiations. Thus, rather than being "peripheral" to the concerns of the NLRA, the Board goes to the heart of the collective bargaining process.

Accordingly, we find that the Daily News is likely to succeed in its argument that the Board of Inquiry is preempted by the NLRA.

## CONCLUSION

Based on our findings that the Daily News will suffer irreparable harm if the Board is allowed to proceed, and that the Daily News is likely to succeed on the merits of its argument that the Board of

Inquiry is preempted by the NLRA, the Daily News' application for a preliminary injunction is granted. Accordingly, it is hereby ordered that the defendants be and are hereby restrained and enjoined from taking any further action pursuant to Sections 800–805 of New York Labor Law for the purpose of inquiring into the causes and circumstances of the dispute between the plaintiff and the union, and the Commissioner is hereby directed to dissolve immediately the Board of Inquiry. The Daily News must post a $10,000 bond with the Clerk of the Court by 2:00 p.m. on August 13, 1990.

SO ORDERED.