Robert P. WESTIN, Plaintiff,

v.

Robin McDANIEL, et al., Defendants.

Civ. A. No. 91–75–3–MAC(DF).

United States District Court,
M.D. Georgia,
Macon Division.

April 1, 1991.

**1564**

Hulane E. George, Milledgeville, Ga., for plaintiff.

Marc T. Treadwell, Macon, Ga., Joseph A. Boone, Irwinton, Ga., Neal B. Childers, Atlanta, Ga., for defendants.

FITZPATRICK, District Judge.

In this unusual case filed under 42 U.S.C. § 1983, the plaintiff has moved this court to issue a preliminary injunction prohibiting the State of Georgia from seeking to have him indicted on criminal charges. Jurisdiction is based on § 1983 and 28 U.S.C. § 1343. The court is well aware of the importance of the issues presented, and after reviewing both the facts and the law, has decided to grant the requested injunction.

## I. BACKGROUND

Robert Westin is an attorney in Gordon, Georgia, in Wilkinson County. He practices by himself and, in addition to having a substantial criminal law practice, serves as a Judge of the Recorder's Court in Gordon and city attorney for the town of McIntyre.

Also in Wilkinson County, Doug Sanders and Alana Fuller, his girlfriend, had been acting as confidential informants for Robin McDaniel, an agent of the Ocmulgee Drug Task Force, in hopes of receiving lenient treatment on their own pending drug charges. At one point, they divulged to a third person that he was a target of McDaniel's investigation. After learning of this, McDaniel had them arrested on additional drug charges, after which they again agreed to cooperate with her.

After being released, Sanders and Fuller changed their minds. On February 6, 1991, at the home of Sanders' mother, they requested that Westin represent them, and informed him that McDaniel was working undercover at Layson's Bar, in Gordon, using the name "Natasha Childers." Westin agreed to act as their attorney, and decided to speak with McDaniel. From this house, Westin saw McDaniel leave Sanders' nearby house before he could contact her. Sanders attempted to contact McDaniel through her beeper, but was unsuccessful. Westin called the bar, asked if Natasha was there and hung up after being told that she was. He then went to the bar, and upon entering saw McDaniel at the bar talking with the bartender. He walked up to the agent and said, "Hi, Robin." When McDaniel told him that her name was Natasha, Westin corrected himself, all in a conversational tone of voice. Westin then identified himself as an attorney, and McDaniel immediately requested that they go upstairs to continue their conversation.

Upstairs and away from others in the bar, Westin related that he now represented Sanders and Fuller, who no longer wished to work for McDaniel, and that in the future any communications between McDaniel and his clients would have to go through him. The conversation continued as Westin tried to find out more about the charges facing his clients; they also discussed the drug problem in Gordon generally. McDaniel expressed the fear that Sanders and Fuller had blown her cover already, but Westin assured her that he had told them to say nothing about their case. Westin then left.

McDaniel, believing that the others in the bar were acting strangely towards her after the conversation with Westin and that her cover had been blown, left and went to Robert Williams, the head of the Ocmulgee Drug Task Force, to tell him what had happened. He contacted Joseph Briley, the District Attorney for Ocmulgee Judicial Circuit. After their conversation, Briley considered the matter for a few moments, then called back and directed McDaniel to swear out a warrant for Westin's arrest on charges of hindering a law enforcement officer, a violation of O.C.G.A. § 16–10–24.[1]

---

1. O.C.G.A. § 16–10–24 reads:
   **16–10–24. Obstruction or hindering of law enforcement officers.**
   (a) Except as otherwise provided in subsection (b) of this Code section, a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor.

McDaniel was unable to tell the Magistrate whether the charge was to be listed as a felony or a misdemeanor, so that official issued a felony warrant, apparently depending on another judge to downgrade the charge later in the proceedings if he were mistaken.

The next day, February 7, Westin was arrested at his office. Several other persons who had been charged with drug offenses were arrested and booked at the same time. The authorities had alerted the news media, so both newspaper and television reporters were present at Westin's booking. McDaniel gave interviews to both newspaper and television reporters. Williams gave an interview in which he mentioned that disbarment was a possibility for Westin.

Although the Magistrate's court was nearby, Westin was transported to Baldwin County for a bond hearing before the Honorable John Lee Parrott, a Superior Court Judge. Chief Assistant District Attorney Alberto C. Martinez and Hulane E. George, Westin's counsel, were already in Judge Parrott's court on other matters. Martinez had asked Judge Parrott to allow Westin to be brought to Baldwin County. While the attorneys and the Judge were conferring, Westin was left handcuffed in a public area of the Baldwin County courthouse. Eventually, bond was granted in the sum of $10,000.00. Martinez suggested, and Judge Parrott agreed, that as conditions for the granting of bond Westin was to be suspended from the practice of criminal law and from acting as Recorder's Judge. Westin consented and was released.

Sanders had also been arrested, and the next day McDaniel questioned him in jail. Although she knew of the conditions of Westin's bond, she did not inform Sanders that Westin was no longer representing him, and there is no evidence to show that Sanders realized that he no longer had an attorney.

On February 28, a commitment hearing was held before Senior Judge James B. O'Connor, who had been called to preside over it after the judges of the Ocmulgee Circuit recused themselves. At the end of the extensive hearing, Martinez stated that Westin could only be charged with a misdemeanor. Judge O'Connor issued an order on March 1, which dismissed the charges against Westin since there had been no evidence that he had broken the law "knowingly and willfully" as required by O.C.G.A. § 16-10-24(a). The order noted that there was no direct proof that anyone else had overheard the conversation in the bar, although this was possible. Although the court found that Westin had suggested that it might not be safe for McDaniel to continue her activities, the order specifically stated that Westin's conduct was justified in the legitimate interests of his client and possibly himself, since there was reason to believe that McDaniel regarded Westin as a possible target of her investigation.

After this order was issued, District Attorney Briley decided to take his evidence against Westin to the Wilkinson County grand jury and so reconvened that body, although he did not need an indictment to prosecute a misdemeanor. The grand jury was scheduled to meet on the afternoon of March 11, but that morning Westin filed this suit seeking a temporary restraining order, preliminary and permanent injunctive relief and damages. This court entered a restraining order preventing the grand jury from hearing evidence against Westin, and the session was canceled. This court has since heard oral arguments and testimony on two occasions, while the temporary restraining order has been extended by the agreement of the parties and at the request of the court until April 2.

## II. DISCUSSION

The court is well aware of the gravity of the relief requested by Westin. He wants

(b) Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer, prison guard, correctional officer, probation supervisor, parole supervisor, or conservation ranger in the lawful discharge of his official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, by punished by imprisonment for not less than one nor more than five years.

this court to enjoin the State of Georgia from seeking to indict him, a request which raises serious questions. By contrast, the rights he seeks to vindicate hold a near-sacred place in our constitution, and his treatment calls into question the conduct of the State's officers.

A federal court should not interfere in state affairs absent extraordinary reasons. Where such reasons exist, however, intervention is not only permissible, but practically mandated if needed to protect federal rights. The central reason for this policy of non-interference is federalism, a fundamental doctrine of our system of government by which power is shared between the federal and state governments. The presence of a federalism question would present a powerful obstacle to the plaintiff, but whether such a hurdle actually exists depends on whether a case can be said to be "pending" in the state court system and whether substantial proceedings on the merits have taken place in this court. Regardless of whether this problem exists, however, Westin is entitled to the protection of an injunction.

## A. THE ABSENCE OF A FEDERALISM PROBLEM

### 1. Younger v. Harris Does Not Apply

■ The starting point of the court's analysis is the axiomatic rule that, subject to certain rare exceptions, a federal court should not enjoin a pending state criminal proceeding because of the interests of equity, comity and federalism. *See, Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). In *Younger,* the Supreme Court reversed the granting of an injunction against the enforcement of a California criminal statute held unconstitutional on its face. After noting that 28 U.S.C. § 2283 provides only three statutory exceptions to the rule against injunctions,[2]

the Court grounded its opinion on the question of whether Harris had met the burden of showing that an irreparable injury would result without an injunction so as to meet a judicial exception to the rule. The decision that he had not was based on the "fundamental policy against federal interference with state criminal prosecutions," which is itself based on the doctrines that equity should not act when there is an adequate remedy at law and, more importantly, of comity, or the respect for state functions enshrined in our system of government. 401 U.S. at 43–46, 91 S.Ct. at 750–52.

The requirement of an irreparable injury, the Court reasoned, consists of a great and immediate injury, not just the cost, anxiety and inconvenience of having to defend against a single criminal prosecution. "Irreparable" means that "the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* at 46–47, 91 S.Ct. at 751–51. Since Harris had not shown that his prosecution was in bad faith and had an opportunity to assert his constitutional claims in the action pending against him in state court, *Id.* at 49, 91 S.Ct. at 753, an injunction was improper. More specifically, the Court held that "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it, and that appellee Harris has failed to make any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief. . . ." *Id.* at 53–54, 91 S.Ct. at 755.

In order to surmount the hurdle presented by *Younger,* a plaintiff would have to show bad faith enforcement of a state law or other special circumstances. The Supreme Court expressed no view in *Younger,* however, about whether a federal court could act when there is no pending prosecu-

---

**2.** The Anti–Injunction Act, 28 U.S.C. § 2283, provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

Although the phrase "where necessary in aid of its jurisdiction" may at first appear to apply to this case, the Reviser's Note following the statute makes clear that the phrase was intended to recognize the power of federal courts to stay proceedings in state cases removed to federal district courts.

A suit brought under Section 1983 is an "expressly authorized" exception to this statute. *Mitchum v. Foster,* 407 U.S. 225, 242–43, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972).

tion in a state court when the federal case is begun. *Id.* at 40–41, 91 S.Ct. at 748–49. For some time this question was left unanswered. In *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Court held that federal declaratory relief is not precluded, regardless of whether an injunction is appropriate, when no state prosecution is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute, whether an attack is made on the constitutionality of the statute on its face or as applied. *Id.* at 475, 94 S.Ct. at 1223–34. This is so because

> [w]hen no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles.

*Id.* at 462, 94 S.Ct. at 1217. Thus, when there are no pending state proceedings, a declaratory judgment does not offend the principle of federalism.

The next case in this line is *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), in which the Court held, on the particular facts presented, that the issuance of a preliminary injunction was not barred by the *Younger* doctrine since there was no ongoing state criminal proceeding against two of the three parties accused of violating a state statute. The state's interests were only slightly implicated in such circumstances, since "neither declaratory nor injunctive relief can directly interfere with enforcement of contested statute or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute." *Id.* at 930–31, 95 S.Ct. at 2567–68.

In *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), the Court affirmed the granting of a permanent injunction against the prosecution of the plaintiffs under an unconstitutional statute after they had already been prosecuted and convicted and faced the same prospect in the future. The Court summarized its previous holdings by stating that

> [i]n *Younger* the Court recognized that principles of judicial economy, as well as proper state-federal relations, preclude federal courts from exercising equitable jurisdiction to enjoin ongoing state prosecutions. (citation omitted). However, when a genuine threat of prosecution exists, a litigant is entitled to resort to a federal forum to seek redress for an alleged deprivation of federal rights. (citing *Steffel* and *Doran, supra* ).

*Id.* at 709–10, 97 S.Ct. at 1432–33.

■ The lesson to be drawn from these decisions is that a federal plaintiff, faced with a threatened, but not pending, state criminal prosecution may obtain a preliminary injunction from a federal court barring such a prosecution free from the obstacle presented by the *Younger* doctrine and its federalism concerns, if he can meet the equitable requirements for such relief. *See, Weissman v. City of Alamogordo,* 472 F.Supp. 425 (D.N.M.1979). Although the determination of whether there is a pending case is important, the court must also remember that even if there was no pending state case when the federal complaint was filed, the federal claim must still be dismissed if state court proceedings start before any proceedings of substance on the merits have taken place in federal court. *Hicks v. Miranda,* 422 U.S. 332, 349–50, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975). The court must next decide whether there is in fact a case pending against Westin in the Georgia courts. There is not.

■ When Judge O'Connor issued his order dismissing the charges against Westin due to a lack of probable cause, a decisive link in the chain of events was broken. Whatever case District Attorney Briley had was killed. His decision to seek an indictment from a reconvened grand jury on the misdemeanor charge (an apparently permissible, but suspicious, act) was an attempt to revive the corpse of a dead case. It makes little sense to say that there could still be a pending case against Westin after a superior court judge, after an exhaustive hearing where the State presented exten-

sive evidence and was represented by an experienced attorney, found that there was no probable cause to believe that Westin had violated O.C.G.A. § 16–10–24. If this were true, the District Attorney could, as pointed out to the court during the oral arguments held on March 26, do nothing immediately but continue to list the case as pending until the expiration of the statute of limitations. Justice and common sense will not allow a person, against whom charges have been dismissed, to live under such a sword of Damocles at the whim of the State.

The temporary restraining order, therefore, stopped an entirely new attack against Westin after the State's case had been dismissed. Viewed from this perspective, there was certainly no state criminal case pending against Westin, primarily because such a case would not have become "pending" until the grand jury returned a true bill, assuming it would have done so, and in any case because the temporary restraining order allowed for substantial proceedings on the merits, in the form of the preliminary injunction hearing held on March 12, 1991, to occur in this court before the State took any steps against Westin.[3]

This conclusion is supported by *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), where the Supreme Court decided that where a state grand jury had not been convened and indictments were not obtained until after the filing of the federal complaint, which sought declaratory and injunctive relief, no state "proceedings" were pending within the intention of the Anti–Injunction Act, 28 U.S.C. § 2283. *Id.* at 484 n. 2, 85 S.Ct. at 1118–19 n. 2. Logically, the same facts

should yield the same conclusion under the *Younger* doctrine, a result indicated in *Langley v. Ryder*, 602 F.Supp. 335 (W.D. La.1985), where plaintiffs who had been charged with offenses against state law allegedly committed on federal land sought an injunction prohibiting the state from proceeding against them in state court. Before issuing the injunction, the court held that § 2283 did not apply even though warrants had been issued and arrests had been made at the time of the filing of the federal complaint, because no bill of information or indictment had been filed in state court. The court also held that the *Younger* doctrine did not apply, since the district attorney had not commenced state criminal proceedings before any proceedings of substance on the merits had taken place in federal court. 602 F.Supp. at 338–39. The implication is that the state's case would not have commenced for *Younger* purposes until the filing of a bill of information or indictment.

Based on the facts of this case and the supporting case law, the court concludes that there is no case pending against Westin in state court, and so the *Younger* doctrine does not apply. The State's interest in this case is a more distant one than in those cases where *Younger* has been applied, and so "the opportunity for adjudication of constitutional rights in a federal forum ... becomes paramount." *Trainor v. Hernandez*, 431 U.S. 434, 449, 97 S.Ct. 1911, 1921, 52 L.Ed.2d 486 (1977) (Blackmun, J., concurring).

### 2. Equitable Requirements for an Injunction

Even though *Younger* does not apply, Westin must still satisfy the equitable re-

---

**3.** The requirement that a federal court abstain if no proceedings of merit have occurred in a federal suit when a state action is filed was formulated to avoid trivializing the principles of *Younger* by allowing a party to get an injunction from a federal court by beating the state to the courthouse. *Hicks,* 422 U.S. at 349–50, 95 S.Ct. at 2292.

The court is of course aware that its own temporary restraining order was the vehicle which allowed proceedings of substance on the merits to occur here before the state grand jury could hear evidence against Westin, but does not believe that this fact changes the outcome. Any concerns about federal courts using tempo-

rary restraining orders to establish and preserve injunctive jurisdiction by interfering in state judicial systems can be answered by examining the nature of such orders. They are by definition temporary, extraordinary and require an immediate hearing to protect the opposing party. *See,* Federal Rule of Civil Procedure 65(b).

As explained in the text, the State would not have had a case pending against Westin until the filing of an indictment, and so comity and federalism concerns are not implicated at this point. The principles of *Younger* have not been trivialized, and there is no reason to deny Westin his right to a federal forum based on these facts.

quirements for an injunction. A preliminary injunction is an extraordinary remedy, and should not be granted unless good cause is shown. The requirements that Westin must meet are well known. He must show: (1) a substantial likelihood that he will prevail on the merits; (2) that he will suffer irreparable harm unless the injunction is granted; (3) that the threatened injury to him outweighs the damage to the opposing party; and (4) that the injunction, if issued, will not be adverse to the public interest. *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1354–55 (11th Cir.1983). The court will examine each of these factors in turn.

### (a) A Substantial Likelihood of Prevailing on the Merits

This court has closely examined the briefs on the question of whether an injunction should issue filed by the parties and by *amici curiae* as requested by the court. Additionally, the court held a hearing before issuing the temporary restraining order, and has held two hearings, the first of which contained the testimony of live witnesses, on the present motion. Based on these elements, the court believes that there is a substantial likelihood that Westin will prevail on the merits of his lawsuit by establishing that the defendants acted in bad faith and with retaliatory motives.

### (b) An Irreparable Injury

■ This is the single most important requirement for an injunction. In order to establish the element of irreparable injury, Westin must show that he has no adequate remedy at law, meaning that the injury must be actual and imminent, not remote and speculative, and requires a remedy of more than money damages. *New York News, Inc. v. State of New York*, 745 F.Supp. 165 (S.D.N.Y.1990); *La Plaza Defense League v. Kemp*, 742 F.Supp. 792 (S.D.N.Y.1990). The mere necessity of making an informed approximation of damages does not preclude the adequacy of a legal remedy, but where damages are clearly difficult to assess and measure, then the legal remedy is inadequate. *Rosenfield v. W.B. Saunders*, 728 F.Supp. 236 (S.D.N.Y.1990). Monetary losses can rise to the level of an irreparable injury, however, if the party seeking an injunction will be forced out of business without it. *Great Salt Lake Minerals and Chemicals Corp. v. Marsh*, 596 F.Supp. 548 (D.Utah 1984).

■ There is no doubt that the threatened injury to Westin in this case, that of having to undergo a grand jury investigation despite having a substantial likelihood of prevailing on the merits of his federal suit, is immediate and not speculative. This court's temporary restraining order was issued just hours before District Attorney Briley was to take his evidence before a reconvened grand jury. Whether he will again attempt to do so if an injunction is not issued is not a speculative matter at all; the evidence heard by this court shows that he certainly will.

The court believes Westin's claims that his law practice and, more importantly, his reputation have suffered greatly since his arrest. A grand jury investigation will only compound this injury and cause even more harm. As stated above, the court also believes that Westin has a substantial chance of prevailing on the merits of his federal suit, meaning that for the purposes of this section of its analysis, the court has determined that Westin's claims of bad faith prosecution and retaliation have merit. The damage caused by a grand jury investigation initiated under these motives would certainly be irreparable in the sense that money damages cannot provide adequate compensation. Moreover, even if a money award could make Westin whole, this court cannot begin to calculate it, especially since if the grand jury were to return a true bill, Westin's law practice would almost certainly be ruined. It is difficult to conceive of how a money award could compensate Westin under such circumstances. Even if he were to be vindicated in a state court trial, the damage will have been done. If the grand jury declines to indict him, there is nothing to stop the District Attorney from presenting his case to a second grand jury at a later time.

The State's attempts to show that Westin would have an adequate remedy in state

court are unconvincing. Although it is certainly true that the cost and anxiety of having to defend against a criminal prosecution do not constitute an irreparable injury, and so Westin could conceivably seek relief from a state court, a federal forum is not closed where there has been a showing of bad faith or harassment, which the court believes has been made here. *Kugler v. Helfant*, 421 U.S. 117, 124–25, 95 S.Ct. 1524, 1530–31, 44 L.Ed.2d 15 (1975). Any reliance on *Blalock v. U.S.*, 844 F.2d 1546 (11th Cir.1988), to show that Westin has an adequate remedy at law is misplaced. The court in that case refused to enjoin allegedly tainted grand jury proceedings, reasoning that the plaintiff had an adequate remedy at law in the form of a motion to quash the indictment, if one was issued. The distinguishing factor in *Blalock*, however, is that in that case the grand jury investigation was already in progress, meaning that the scope of judicial review was much narrower. 844 F.2d at 1550 n. 5. Here, Westin is seeking to block a grand jury investigation before it starts, a less disruptive situation. Westin has satisfied this court that he will suffer an irreparable injury if an injunction does not issue and the grand jury is allowed to hear evidence against him.

### (c) The Threatened Injury Outweighs the Damage to the Opposing Party

District Attorney Briley's attempt to take this case before the grand jury occurred well within the statute of limitations for criminal cases. The granting of a preliminary injunction until the resolution of Westin's federal suit for damages and declaratory relief will do little or no harm to the State, since if Westin loses the underlying case a grand jury can then hear evidence against him. The threatened injury to Westin more than outweighs the damage to the State caused by delaying its efforts.

**4.** The State's claim that there is a pending case was explained at the March 26 hearing. The theory is that since the District Attorney was not bound by Judge O'Connor's decision and could take his evidence before the grand jury despite it, the decision to do so was merely a continuation of the same case. If this were not true, the State reasons, then Westin could make a res

### (d) The Injunction Must Not be Adverse to the Public Interest

Westin has also met this requirement. The only possible harm to the public interest by the granting of an injunction would be the delay caused by the resolution of the underlying suit, and in truth the court does not believe that this represents any harm to the public at all. If Westin ultimately wins his civil suit, the public interest will have been served by the granting of a preliminary injunction preventing unjust retaliation against him by state officers. The granting of an injunction will therefore not harm the public interest, and, depending on the result of Westin's suit, may serve it.

The court is satisfied that Westin has met all of the requirements for injunctive relief.

### B. THE PRESENCE OF A FEDERALISM PROBLEM

Assuming, in the alternative, that there is somehow a case pending against Westin in state court,[4] he would be required to make a showing of bad faith in the decision to prosecute him in order to surmount the obstacle presented by *Younger.* As the Supreme Court explained:

> When a state criminal proceeding under a disputed state criminal statute is pending against a federal plaintiff at the time his federal complaint is filed, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), held, respectively, that, unless bad-faith enforcement or other special circumstances are demonstrated, principles of equity, comity, and federalism preclude issuance of a federal injunction restraining enforcement of the criminal statute and, in all but unusual circum-

judicata claim. Although this theory may have some merit, the court prefers to believe that Judge O'Connor's order ended the case against Westin, partly since if a finding of no probable cause can simply be ignored by prosecutors, there would appear to be little reason to have commitment hearings.

stances, a declaratory judgment upon the constitutionality of the statute....

*Steffel*, 415 U.S. at 454, 94 S.Ct. at 1213. Although *Steffel* concerned declaratory relief, an examination of the Supreme Court cases discussed previously shows that these same principles apply to a request for injunctive relief.

The requirements of a bad faith showing were given in *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir.1979).[5] Criminal charges against the two plaintiffs in that case were placed on the "dead docket," meaning they were not to be prosecuted once a term of voluntary parole was completed, but were revived when one plaintiff filed a civil suit against the arresting deputies. The plaintiffs then sought an injunction against their prosecution, claiming that the criminal charges had been placed on the trial calendar in retaliation for their exercising their first amendment right to seek redress of their grievances. Although the court remanded the case for further fact-finding, it also held that the plaintiffs did not have to show the threat of repeated prosecutions to establish bad faith, *Id.* at 1375, and that irreparable injury is established for injunctive purposes if a "federal plaintiff demonstrates that the state prosecution against him was brought in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights." Such a showing makes inapplicable the comity rationale of *Younger*, since a state has no legitimate interest in pursuing a bad faith prosecution. 593 F.2d at 1383.

The court went further, however, and in a well-reasoned and thorough discussion outlined the requirements for injunctive relief. Noting that in order to meet the injunctive requirement of likely success on the merits the plaintiffs must show the likely applicability of the *Younger* bad faith exception, *Id.* at 1384–85, the court then gave the content of the test to be applied in a suit seeking to enjoin a criminal prosecution allegedly brought in bad faith as follows:

... The Court should consider whether the plaintiffs have shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

*Id.* at 1387. Regarding the second part of the test, it is not enough for a plaintiff to show that the prosecution was brought "solely in response to" the constitutionally protected conduct; he must show that it was motivated in part to retaliate for or deter such conduct. Relevant factors to be considered in the third part of the test include whether the state prosecution was undertaken with no valid hope for a conviction and the significance of the alleged criminal activity. *Id.* at 1388, 1387 n. 22; *see also, Perales v. Casillas*, 903 F.2d 1043, 1052 (5th Cir.1990).[6]

The same result was reached in *Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir.1981), where the court affirmed the district court's granting of a permanent injunction against the prosecution of the plaintiffs for exercising their first amendment rights. The court first noted that a "showing of

---

5. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedents all decisions of the former Fifth Circuit issued before October 1, 1981.

6. The Eleventh Circuit has held that the *Wilson* test is not applicable where bad faith is evident as a matter of law. *Rowe v. Griffin,* 676 F.2d 524, 528 n. 6 (11th Cir.1982). In *Rowe,* a district attorney attempted to prosecute for murder a defendant who had been granted transactional immunity in exchange for his testimony without any indication that the defendant had testified untruthfully or failed to perform his part of the bargain. This was held to be a *per se* bad faith prosecution. The facts in the case at bar do not rise to this level, since Westin was not offered any type of immunity in exchange for his testimony. He must therefore proceed under the *Wilson* test.

bad faith or harassment is equivalent to a showing of irreparable injury under *Younger*, and irreparable injury independent of the bad faith prosecution need not be established." In further enunciating the standards a plaintiff seeking an injunction must meet, the court stated that the threat of multiple or repeated prosecutions need not be shown to establish bad faith prosecution, nor must the plaintiff prove that the prosecution could not possibly result in a valid conviction. The court then repeated the test established in *Wilson,* and decided that the evidence supported the district court's decision. *Id.* at 944–45.

An examination of the record of this case shows that Westin has established bad faith under the *Wilson* test, and so has shown an irreparable injury so that the principles underlying *Younger* will not be offended by the granting of the injunction to which he is entitled.

### 1. Constitutionally Protected Conduct

First, Westin must show that the conduct sought to be deterred or retaliated against is constitutionally protected. His right to freedom of speech under the first amendment certainly meets this standard. Some general principles applicable to this question were given in *Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), where the plaintiff filed a civil rights action after being arrested for violating a city ordinance making it illegal to oppose or interrupt an officer in the performance of his duty. In striking down the ordinance as overbroad, the Court recognized that the first amendment protects a significant amount of verbal criticism and challenge directed at police officers, and cited several cases where words overtly insulting or hindering police officers were held to be permissible. An exception, of course, exists for " 'fighting words' which 'by their very utterance inflict injury or tend to incite an immediate breach of the peace.' " The Court noted that the impairment of the efficiency of government agents caused by verbal challenges is a necessary sacrifice in order to avoid the

danger of omnipotent officialdom. *Id.* at 461–63, 107 S.Ct. at 2509–11.

Westin's words meet these guidelines. If the constitution protects speech which publicly and intentionally hinders or interrupts an officer, then Westin's identification of McDaniel by her true name, which has all the markings of an innocent mistake, and the subsequent conversation are certainly protected speech also. Although it is conceivable that mere words can rise to the level of obstructing an officer as forbidden by O.C.G.A. § 16–10–24, this is not such a case. Despite the testimony of Agent McDaniel, the court sees no reason to believe that Westin's words put her in any danger or that they were overheard by anyone else in the bar, and so their very utterance inflicted no injury and did not tend to incite an immediate breach of the peace. *Fitzgerald, supra,* is similar in that the plaintiffs there also sought, and got, an injunction barring prosecution in retaliation for exercising their first amendment rights.

Additionally, it must be remembered that Westin was acting as an attorney representing his client. His status as an attorney does not, of course, excuse the commission of a crime, but the court recognizes that the attorney-client relationship is a privileged one in our society, and that the existence of such a relationship requires an attorney to sometimes take affirmative steps to guard the interests of his client. This is especially true when the client is involved in a criminal matter. Westin's visit to the bar was just such an undertaking. By exercising his first amendment rights, he was attempting to protect his clients' sixth amendment rights, and to allow his prosecution to proceed would infringe on the rights of both clients and counsel. Westin's actions were constitutionally protected.

### 2. A Retaliatory Prosecution

Westin must also show that the decision to prosecute him was motivated at least in part by the District Attorney's desire to retaliate for his exercising constitutionally protected conduct.[7] The facts of this case certainly meet this standard.

---

**7.** At this point the court is to consider only whether the actual decision to prosecute Westin

was made for improper motives, but feels obliged to point out some of the other suspi-

The first circumstance to be considered is the decision of District Attorney Briley to order Westin's arrest. After being told over the phone what had happened at the bar, he pondered the situation for only a few minutes before calling back and directing that a warrant be taken out. He neither attempted to contact Westin or make any other type of investigation, even though he has a high regard for Westin. (March 12 Trans., p. 118). He also did not instruct any other law enforcement officers to make any kind of investigation.

At the commitment hearing, the State was represented by Assistant District Attorney Martinez. McDaniel and Williams testified for the State and at the end of their lengthy testimony, Martinez admitted that the charges amounted only to a misdemeanor.

After Judge O'Connor ordered the charges dismissed, Mr. Briley then reconvened the grand jury to hear his case against Westin. Although he testified that he had cases other than Westin's to present, *including murder and drug charges*, he failed to present any of these other cases and in fact dismissed the grand jury once this court's temporary restraining order stopped him from presenting evidence against Westin. (March 12 Trans., pp. 69–71). The conclusion that the grand jury was recalled solely to hear the charges against Westin is inescapable.

Briley testified that his motive in recalling the grand jury was to give Westin the benefit of an additional tribunal on this misdemeanor charge, as opposed to simply filing an accusation, after Judge O'Connor specifically held that the State had failed to make its case at the commitment hearing. He apparently decided that Judge O'Connor's order contained a mistake and recalled the grand jury just ten days after the issuance of that order without seeing a transcript of the commitment hearing. (March 12 Trans., pp. 117–22). The recalling of the grand jury would, presumably, receive much publicity. It would also give the State a second chance at establishing probable cause, this time in a more favorable atmosphere.[8]

Based on the totality of the circumstances, Westin has carried his burden of showing that the decision to prosecute him was based at least in part on retaliatory motives.

### 3. Whether the State Would Have Prosecuted Anyway

At this point in the court's analysis, the burden is on the State to show that it would have reached the decision to prosecute even if the impermissible motive had not been present. As explained in *Wilson*, relevant factors in this part of the test include whether the state prosecution was undertaken with no valid hope for a conviction and the significance of the alleged criminal activity. 593 F.2d at 1387 n. 22.

The State has not carried its burden, and the court cannot believe that it would have carried the proceedings as far as it did if there were no desire to retaliate against Westin. Based on Judge O'Connor's order and the testimony and evidence before this court, the State had no hope of proving

---

cious circumstances of this case. The actions of Agent McDaniel and her superiors are unsettling. At the commitment hearing, she testified that her task force concentrates on people with assets, apparently not so much due to any suspicions of illegal activity, but because it needs forfeitures for funding. (Commitment Hearing Trans., pp. 53–54). Even more disturbing is the fact that Agent McDaniel visited Sanders, who had been Westin's client, the very next day after Westin agreed to stop practicing criminal law. (Trans., pp. 71–72). This questioning should never have taken place, since although technically Westin was off the case, McDaniel certainly should have known that Sanders desired a lawyer. There has been no evidence at all that

Sanders knew of the conditions of Westin's bond, i.e. that he no longer was represented by an attorney.

Much has been made of the fact that Westin agreed to the conditions given at the bond hearing. This is unimpressive, since he probably would have agreed to anything to win his freedom and spare himself additional humiliation.

**8.** There is the suggestion, possible but not proven, that Briley recalled the grand jury in an attempt to get a finding of probable cause and so insulate himself from a suit for false arrest and malicious prosecution. Whether this would have been successful is a question beyond the scope of this order.

that Westin violated O.C.G.A. § 16-10-24(a) knowingly and wilfully, as required by that statute.[9] In fact, the State has not satisfactorily shown that Westin's words exposed the investigation, since there has been no solid evidence that the conversation in the bar was overheard.[10]

The defense has argued that the record cannot be read to say that there was no valid hope for a conviction, since the State did not present all of its evidence at the commitment hearing. At the hearing held before this court on March 26, Mr. Childers argued that the State was under no obligation to put its best case forward at the commitment hearing, and so was entitled to another chance to do so before a grand jury, and that the purpose of the commitment hearing was to determine probable cause to detain, not to prosecute.

At that hearing, however, the State was represented by an able and well-prepared Assistant District Attorney, and the testimony of the witness was substantially the same as what this court heard (if anything, the testimony before Judge O'Connor was more detailed than that before this court), but probable cause was still found to be lacking. Defendant McDaniel, for example, testified under oath and in great detail at the commitment hearing about the events leading to the plaintiff's arrest. After hearing her testimony, Judge O'Connor decided that Westin had not "knowingly and willfully" violated O.C.G.A. § 16-10-24(a). It is inconceivable that her testimony before the grand jury could produce additional facts that would add the essential element of intent by the plaintiff that was lacking before. Contrary to counsel's assertions, a judge at a commitment hearing is empowered to determine whether there is probable cause to believe the defendant is guilty, a decision which can include the authorization to keep a defen-

dant in custody. *See,* O.C.G.A. § 17-7-23 and annotated cases. These circumstances lead this court to believe that the State almost certainly was presenting its best case at the commitment hearing, and would have made the same effort before the grand jury, so that the earlier determination that probable cause was absent is a good indication that there was no hope for a valid conviction.

Mr. Treadwell, also representing the defendants, noted that Judge O'Connor may well have found probable cause if Westin had been able to testify at the earlier hearing, as he did before this court. This does not help the State's case, however, since Westin would not have testified before the grand jury either, and so the State's case before that body could not have been any better than its efforts before Judge O'Connor in this respect.

Finally, this court cannot believe that the significance of these misdemeanor charges could justify the effort the State has put into this case if the desires to retaliate for Westin's acts and possibly to deter other criminal defense attorneys were not present. Much time and effort by high-ranking officials has been put into the case against Westin, and a grand jury was reconvened to hear a misdemeanor charge after a judge specifically found no probable cause to turn the case over to that body. Taken alone, these factors and those discussed above might not amount to much, but when considered together the conclusion to which they lead is clear.

In sum, Westin has established to the satisfaction of this court that the decision to prosecute him was motivated by bad faith under the elements of the *Wilson* test, meaning that, assuming there is a case pending against him in the state judicial system, the *Younger* doctrine has been overcome. Based on the passage quoted

---

**9.** It has been claimed that Westin could have contacted McDaniel in some other fashion without any risk at all, and so he must have known what he was doing when he entered the bar. It is certainly true that Westin could have spoken with McDaniel from a distance and so insulated himself from any liability. The court does not mean to imply that his conduct was above reproach, but his desire to meet personally with

McDaniel was somewhat justified since he was acting as an attorney representing his client. In any case, had he really desired to expose her, an anonymous phone call to the bar revealing her identity would have been sufficient.

**10.** If there had been testimony from somebody in the bar to this effect somewhere in the record, then this could have been established.

above from *Steffel*, 415 U.S. at 454, 94 S.Ct. at 1213, the court does not believe that Westin must show that his case meets the traditional injunction requirements once he has carried his burden under *Younger* by showing bad faith.[11]

## III. CONCLUSION

This order has not been easy to write. There are few principles of government more important and deserving of deference by a United States District Court than that of federalism. A deference that a cynic might observe has, for the past thirty years at least, been more often than not honored in the breach.

Nevertheless, this judge is, I hope, particularly sensitive to the delicate balance that makes our system of government so unique in the world. On the other hand, this court is duty bound to protect the citizens of this State and nation from unlawful infringement of their particular liberties guaranteed by the Bill of Rights to our constitution. Proceeding through the numerous appellate decisions that first seem to point one way and then the other is not unlike negotiating a minefield where a misstep can be fatal (the definition of "fatal," however, is somewhat looser for the purposes of this order than in the analogy).

Fortunately, the Supreme Court and the various appellate courts have given the district courts a map of this dangerous terrain so that by carefully following the directions contained therein a District Judge can, if he is careful, be guided through this legal minefield and reach a decision that respects both the time honored doctrine of federalism and the equally time honored rights of a citizen whose first amendment guarantees are in peril. This court feels that the analysis and conclusion of this order honor both and harm neither.

This case, with its unique facts, has presented the court with difficult issues to resolve and concerns to balance. Undercover agents perform vital, often dangerous, work in the fight against the drug trade, and their efforts are not unappreci-

ated. The labors of criminal defense attorneys are no less important. Given the circumstances of this case, with the accompanying evidence of bad faith and retaliation, equity favors granting a preliminary injunction, whether the *Younger* doctrine and its concern for federalism does not apply or does apply and has been overcome.

Accordingly, the District Attorney's Office of the Ocmulgee Judicial Circuit is hereby enjoined from proceeding against Robert P. Westin in any fashion, including the presenting evidence to a grand jury or the filing of an accusation, pending the outcome of this federal suit.

SO ORDERED.

---

11. In the cases examined by the court where plaintiffs were found to have overcome *Younger*, that alone was held to be sufficient to justify an injunction. In the event that Westin is some-

how required to establish the four injunctive relief requirements at this point, he has already done so, as previously discussed in the text.